**BARNWELL BROS., Inc., et al. v. SOUTH CAROLINA STATE HIGHWAY DE-PARTMENT et al.**

District Court, E. D. South Carolina.
Jan. 20, 1937.

S. King Funkhouser, of Roanoke, Va., J. Ninian Beall, of Washington, D. C., and Frank Coleman, of Roanoke, Va. (S. King Funkhouser, of Roanoke, Va., J. Ninian Beall, of Washington, D. C., and Frank Coleman, of Roanoke, Va., on the brief), for plaintiffs.

John M. Daniel, J. Ivey Humphrey, and M. J. Hough, all of Columbia, S. C., and Eugene S. Blease and Steve C. Griffith, both of Newberry, S. C., for defendants.

Thomas W. Davis, of Wilmington, N. C., and Douglas McKay, of Columbia, S. C., for Atlantic Coast Line Ry. Co., intervener.

J. B. S. Lyles, of Columbia, S. C., for Seaboard Air Line Ry., intervener.

M. G. McDonald, of Greenwood, S. C., for C. & W. C. Ry. Co., intervener.

E. M. Reidy and Thomas M. Ross, both of Washington, D. C., for Interstate Commerce Commission, intervener.

John E. Benton, of Washington, D. C., amicus curiæ.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

PARKER, Circuit Judge.

This is a suit to enjoin the enforcement against trucks which are being operated in interstate commerce of the provisions of sections 3, 4, 5, 6, and 7, relating to size and weight, of Act No. 259 of the General Assembly of South Carolina, approved April 28, 1933, 38 St. at Large, p. 340. The plaintiffs are either corporations engaged in operating truck lines in interstate commerce, or persons or corporations engaged in shipping produce or merchandise by truck in interstate commerce. The defendants are the various officials of the state of South Carolina who are charged with the duty of enforcing the act. Intervention has been allowed on the part of one shipper, who was not a party to the original bill, and of certain railroad companies, who are interested in seeing the act enforced, on the ground that enforcement thereof will free them of competition based on violation of law. The Interstate Commerce Commission also has been allowed to intervene.

The bill as originally filed did not ask for interlocutory injunction, and a motion to dismiss was heard by the District Judge and was allowed as to the allegations of the bill which merely alleged violation of the due process and equal protection clauses of the Fourteenth Amendment and generally that the provision of the act constituted a burden on interstate commerce, but was disallowed as to allegations that the act constituted a regulation of interstate commerce with respect to matters covered by the Motor Carrier Act of 1935 (49 U.S.C.A. §§ 301–327). The plaintiffs thereupon asked for an interlocutory injunction forbidding the enforcement of the act pending a final hearing, and the judge granted a temporary restraining order and convened a court of three judges pursuant to section 266 of the Judicial Code (28 U.S.C.A. § 380). At the hearing before this court of three judges, it was decided to recon-

sider all the questions raised by the bill and answer and give judgment thereon in order that all matters involved in the litigation might be disposed of promptly and heard on one appeal. None of the parties objected to this course, but on the contrary expressed a desire that action be taken which would expedite the final decision of the cause. In our opinion, there could be no valid objection to this course, as the court of three judges could unquestionably permit an amendment of the bill before it, and could permit the plaintiffs to reintroduce, by such amendment, such portions of the bill as had been stricken on the motion to dismiss; and this, in effect, was what was done. It was thereupon agreed that upon the evidence to be presented the cause would be submitted for final decree by the court, and not merely in support of the application for interlocutory injunction; and the court has heard the parties fully, the evidence being directed to whether the size and weight provisions of the statute complained of constitute an unreasonable burden upon interstate commerce.

The statute in effect in South Carolina prior to the passage of the act complained of was Act No. 685, Laws of 1930 (36 St. at Large, p. 1192). It prescribed a gross weight for single vehicles of 25,000 pounds, with a maximum axle load of 10,000 pounds, and a maximum weight of any combination of vehicles of 40,000 pounds. The act of 1933 limited the gross weight of any vehicle to 20,000 pounds and provided that any "tractor (or motor propelled truck), together with the semitrailer" should "be considered one unit," so that a limitation of 20,000 pounds was put on the tractor-semitrailer unit, as to which a maximum weight of 40,000 pounds had been allowed under the preceding law. Both the 1930 act and the act of 1933 contain provisions limiting the width of trucks to 90 inches. The bill attacks these three provisions of the act, viz.: (1) The one limiting the gross weight of single trucks to 20,000 pounds; (2) the one providing that a tractor-semitrailer shall be considered a single unit for the purpose of determining weight and thereby limiting the weight of such combination to 20,000 pounds; and (3) the one limiting width to 90 inches. The attack is made on three grounds: (1) That the provisions of the act in ques-

tion are in violation of the Fourteenth Amendment, in that "they constitute an unreasonable, arbitrary and capricious interference with the rights of plaintiffs to use the highways in a reasonable manner and for a lawful purpose"; (2) that they have been superseded by the Federal Motor Carrier Act of 1935; and (3) that they constitute an unreasonable burden upon interstate commerce.

■ Little need be said as to the first ground of attack, i. e. that the statute is violative of the Fourteenth Amendment. This is sufficiently dealt with by the Supreme Court of South Carolina in the case of State ex rel. Daniel v. John P. Nutt Co., 180 S.C. 19, 185 S.E. 25, cert. denied 297 U.S. 724, 56 S.Ct. 668, 80 L. Ed. 1007, and there is no occasion to add anything to what is there said as to this aspect of the case. We agree with the conclusion there reached on this point.

■ And we are not impressed with the second ground of attack, i. e. that the provisions of the statute have been superseded as a result of the enactment of the Motor Carrier Act of 1935. It is not necessary to inquire into the power of Congress to regulate the size and weight of vehicles used in interstate commerce on the roads of the several states or into the limitations upon that power; for we think it perfectly clear that in the Motor Carrier Act Congress did not attempt to exercise such power, but, on the contrary, expressly refrained from exercising it. Section 225 of that act provides (49 U.S.C.A. § 325): "The Commission is hereby authorized to investigate and report on the need for Federal regulation of the sizes and weight of motor vehicles and combinations of motor vehicles and of the· qualifications and maximum hours of service of employees of all .motor carriers and private carriers of property by motor vehicle; and in such investigation the Commission shall avail itself of the assistance of all departments or bureaus of the Government and of any organization of motor carriers having special knowledge of any such matter."

Reliance is placed upon section 202 (a), 49 U.S.C.A. § 302a, declaring the purpose of the act, and particularly upon section 204 (a) (1–3), 49 U.S.C.A. § 304a (1–3), defining the powers of the Commission, which are as follows:

"202 (a) It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this chapter."

"204 (a) Powers and duties generally. It shall be the duty of the Commission—

"(1) To regulate common carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(2) To regulate contract carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment."

It is argued that authority in the Commission to control size and weight of motor vehicles is to be found in the provisions of section 204 (a) (1) and (2), authorizing the Commission to establish reason-.

able requirements with respect to "safety of operation and equipment" in the case of common and contract carriers, and in the provision of (3) authorizing "standards of equipment" to be prescribed for private carriers. The presumption is hardly to be indulged that Congress intended to include size and weight in "safety of operation and equipment" or "standards of equipment," as to which the Commission was given full power of regulation, when by section 225 (49 U.S.C.A. § 325), size and weight were specifically dealt with and the Commission was authorized merely to investigate as to these and report on the need of regulation. The rule of statutory interpretation is well settled that "general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment. * * * Specific terms prevail over the general in the same or another statute which might otherwise be controlling." Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704; Kepner v. United States, 195 U.S. 100, 125, 24 S.Ct. 797, 49 L.Ed. 114, 1 Ann.Cas. 655; United States v. Chase, 135 U.S. 255, 260, 10 S.Ct. 756, 757, 34 L.Ed. 117. In the case last cited the rule is thus stated: "It is an old and familiar rule that 'where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.' Pretty v. Solly, 26 Beav. 610, per Romilly, M. R.; State v. Com'rs of Railroad Taxation, 37 N.J. Law, 228. This rule applies wherever an act contains general provisions and also special ones upon a subject which, standing alone, the general provisions would include. End.Interp.St. 560."

Indeed, it would be only by a strained construction of language that the provision authorizing the Commission to establish requirements with respect to safety of equipment or standards of equipment could be held to confer power to regulate size and weight of vehicles. Safety of equipment and standards of equipment as applied to vehicles moving in interstate commerce are expressions which naturally have reference to safety with respect to commerce or persons engaged therein over which Congress has undoubted jurisdiction, whereas size and weight are matters which relate chiefly to the safety and preservation of highways, as to which jurisdiction resides primarily in the several states. And it is worthy of note that the regulation of size and weight is treated by road authorities quite generally as a matter altogether different from the regulation of equipment. Thus, in the proposed Uniform Act Regulating Traffic and Highways, as redrafted in 1934 by the National Conference on Street and Highway Safety, of which the Secretary of Commerce was chairman, in co-operation with the National Conference of Commissioners on Uniform State Laws, published by the Bureau of Public Roads of the Department of Agriculture, equipment is dealt with in an entirely separate chapter from size, weight, and load. Chapter 15 of the proposed act deals with equipment and regulates such matters as lights, brakes, horns, mufflers, mirrors, windshields, safety glass, inspection of equipment, etc. Chapter 16 deals with width, height, and length of vehicles, use of trailers, wheel and axle loads, gross loads, etc. The Commission itself has construed the act as not imposing upon it the duty of regulating size and weight; for it has caused its Bureau of Motor Carriers to draft proposed safety regulations to be prescribed by it under the sections of the act which we have quoted, and these proposed safety regulations have no reference to size or weight of vehicles, but are addressed to such matters as "lighting devices and reflectors," "safety glass," "brakes," and "miscellaneous parts and accessories."

If there were any doubt as to the meaning of the act in this respect, and we are not to be understood as implying that we think that there is, the history of the legislation would conclusively demonstrate that it was not the intention of Congress to give to the Commission the power to regulate size and weight. The act was the legislative result of studies made by the Co-ordinator of Transportation under congressional authority. In his report to the Seventy-Third Congress, Second session (Senate Document No. 152), the Co-ordinator called attention in detail to state legislation regulating size and weight (pages 206, 207), referred to the feeling that varying traffic, topographic, and finan-

cial conditions in the different states warranted diversity of weight limitations (pages 213, 214), and with respect to the provision of the bill said (page 45) : "Section 325 of the proposed bill authorizes the Commission to investigate and report to Congress upon the need for Federal regulation of the sizes and weights of all motor vehicles operating in interstate and foreign commerce, and of the qualifications and maximum hours of service of employees, this investigation to cover private as well as for-hire carriers. The Rayburn bill contains no provision respecting these matters except that it provides for regulation of the qualifications and hours of service of the employees of common and contract carriers. While the inquiry made by the coordinator's staff indicates a possible need for these forms of Federal regulation, the subject is one which may appropriately be postponed for future consideration."

In the hearing before the Committee on Interstate Commerce of the Senate, Coordinator Eastman said (at page 92 of hearing on S–1629, Seventy-Fourth Congress) : "In answer to one of your questions I started to say something about the regulations with respect to the sizes and weights of vehicles. It is true that by drastic and unreasonable regulations of that character one State might interfere with interstate commerce and prevent the reasonable operation of vehicles in interstate commerce. We do not undertake in this bill to cover that situation, except to provide for a thorough investigation of it by the Commission, with recommendations to Congress, because there is involved there not only a question of fact as to what the regulation should be but also as to how far the Federal Government has power to interfere with the exercise of the police power by the States with respect to the use of their highways."

The act as originally introduced dealt with qualifications and maximum hours of service of employees, as well as with size and weight, only in section 225. It was amended during its passage, however, so as to give the Commission authority to regulate "qualifications and maximum hours of service of employees"; these words being inserted in subsections 1 and 2 of section 204 (a), and an additional subsection as to private carriers [being subsection 3 of 204 (a)] being added. The

fact that the section prescribing the powers of the Commission were thus amended to include a part of what was already covered by section 225, while the remainder of what was covered by that section, i. e., size and weight, was not included in the amendment, raises a strong presumption that it was not the intention of Congress that the Commission should be given regulatory power over these. The report of the Senate Committee to which the brief of the Commission refers, in saying, "Such an investigation is still authorized (section 225), but if the Commission determines after investigation that there is need for such regulation, it may impose reasonable requirements without further legislation," has reference to the investigation as to need for regulation of qualifications and maximum hours of service of employees, and not to the investigation authorized as to need of regulation of size and weight of vehicles.

The Commission makes an argument based upon the rejection by the Senate of an amendment offered by Senator Duffy which provided in part : " * * * That the laws enacted in any state and regulations thereunder that relate to the maintenance, protection, safety or use of the highways therein, which do not discriminate against motor vehicles used in interstate commerce, shall not be deemed to be a burden on or an obstruction or impediment to interstate commerce, and the power to enact such laws and promulgate such regulations thereunder is hereby expressly recognized and confirmed to the respective states." The answer to this is that the effect of the incorporation of the language quoted in the statute would have been to sanction state regulations of size and weight even though these might amount to an unreasonable interference with interstate commerce and be void for that reason in the absence of congressional approval.

To sum up on this feature of the case, we do not think that there is anything in the language or in the history of the act which shows an intention on the part of Congress to regulate the size and weight of vehicles; and it is unreasonable to think that Congress would intend, by vague general language, to clothe the Commission with power to regulate a matter of such difficulty in which detailed regulations had already been prescribed by all of the 48 states, and thereby strike down all state

regulations affecting the matter and leave the subject unregulated until such time as the Commission might act. Our conclusion as to the proper interpretation of the act is supported by the following recent decisions: L. & L. Freight Lines et al. v. Railroad Commission of Florida (D.C.Fla.) 17 F.Supp. 13, 14; Lowe v. Stoutamire, 123 Fla. 135, 166 So. 310; Railroad Comm. v. Southwestern Greyhound Lines (Tex.Civ.App.) 92 S.W.(2d) 296. In the case first cited, Judge Strumwell said:

"It is significant, and worthy of particular note, that the regulation of 'weights' of such motor vehicles, obviously a most important element of regulation, was not included amongst the matters specifically enumerated in section 204 (a) (1). The act contains no express or specific regulation, nor authority to regulate, motor carriers as to size and weights. If such authority is to be found in the act, it must be spelled out either from the general language 'to regulate common carriers by motor vehicle,' or by interpretation of the term 'safety of operation and equipment.'

"The argument that such authority is to be found in the quoted phrases is refuted by the specific provisions of section 225 of the act (49 U.S.C.A. § 325) that 'the Commission is hereby authorized to investigate and report on the need for Federal regulation of the sizes and weight of motor vehicles and combinations of motor vehicles.' * * * It should be noted that this section does not provide that the Commission shall determine by investigation what the sizes and weights of motor vehicles should be, and thereupon to adopt regulations to put the same into effect. The authority is merely to 'investigate and report on' the 'need' for federal regulation of sizes and weights—a wholly prospective matter, clearly indicating an absence of intent to presently regulate in that respect. If Congress intended to presently regulate in respect of sizes and weights, but desired the Commission to first determine by investigation what the regulations should be and thereafter put the same into effect, more apt language to that end would have, no doubt, been used. Section 204 of the act specifically enumerates practically every aspect of regulation, except sizes and weights. The language of section 225 of the act makes it quite clear that the omission of sizes and weights was no mere oversight, but was deliberate. When that omission is viewed in connection with the language of section 225 of the act authorizing the Commission to investigate and 'report on' the 'need' for federal regulation of sizes and weights, not to determine what such regulations shall be, nor to put any such regulation in effect, but merely to 'report,' the conclusion is inescapable that Congress intended to withhold regulation in that respect until some future time."

We come, then, to the third ground of attack upon the statutory regulations complained of, viz., that they constitute an unreasonable burden upon interstate commerce; and we think that the contention of plaintiffs as to this must be sustained in so far as applied to the operation of trucks upon the standard concrete highways of the state and those highways which constitute the great arteries of interstate commerce, even though short stretches of them are not of standard construction, i. e. federal highways 1, 15–A, 17, 21, 25, 29, and 52. We think it an unreasonable burden upon interstate commerce to apply the 20,000-pound gross load limitation, or the statutory rule requiring that the tractor-semitrailer combination be considered as one vehicle for the purpose of applying the gross load limitation, or the 90-inch width limitation to trucks which do not exceed 96 inches in width, using the standard concrete highways of the state. As the great arteries of interstate commerce above referred to carry the larger part of interstate traffic moving to and from the state, as well as such traffic passing through the state to and from Georgia and Florida and the states to the north, and as these arteries of interstate commerce are constructed almost entirely of standard concrete paving, we think it an unreasonable burden upon the interstate commerce moving over them to enforce the restrictions above mentioned, and thereby virtually close the roads of the state to a large part of such commerce, merely because there are short sections of such highways which have not as yet been constructed of standard paving. As there are a few bridges on these highways which were not built to support the heavy trucks of modern traffic, and a few which are too narrow, we think that the enforcement of the act should not be held unreasonable as to such bridges, provided they are properly marked

with warning signs forbidding trucks of excessive weight or size to enter upon them. The facts upon which these conclusions are based are as follows:

■ Within the past decade there has been a great development of interstate commerce by truck, and a corresponding change and development of industry in the southeastern part of the United States based upon truck transportation. The market gardening industry, the textile industry, the fertilizer industry, and many others have changed in large part their method of doing business as a result of the facilities afforded them by the use of trucks in interstate commerce. This traffic has developed transportation units of great efficiency designed to carry a maximum load with a minimum of burden or strain to the roads over which they pass. Chief among these is the tractor-semitrailer, in which the power unit is detachable from the load carrying unit, and in connection with the latter imposes no greater strain upon the highway than two trucks of corresponding weight, one following the other. Multiplication of axles and wheels distributes the weight of the load, and further protection is obtained from the use of low pressure pneumatic tires, so that with this modern equipment it is possible to move a heavily loaded truck over the highway with no greater injury to the modern standard pavement than would result from the movement over it of an ordinary passenger car. A large part of this interstate traffic, with all that it means to the life of the people of the southeastern part of the United States, will be virtually barred from the highways of South Carolina, and a barrier will be erected not merely against the commerce of the state but also as against the commerce of sister states, if these restrictions are enforced; and the reasonableness of the restrictions must be viewed in the light of such a consequence.

The evidence establishes that South Carolina has the best highway system to be found in the southeastern part of the United States. There are within the state 60,000 miles of roads of all kinds, of which 5,948 miles are embraced in the state highway system. Of these, 2,417 miles are of standard pavement; and the arteries of interstate commerce to which we have referred are of this character with the exception of a few short lengths, as for instance 6 or 7 miles in highway No. 1 near Cheraw, out of a total length of the highway of 140 miles or more. This standard paving is not materially different from modern pavement used in most of the other states of the Union, is 18 or 20 feet in width, 7½ or 8 inches thick at the edges, and 6 or 6½ inches thick at the center. It is capable of sustaining without injury a wheel load of 8,000 or 9,000 pounds and an axle load of from 16,000 to 18,000 pounds.

Where standard paving is involved, it is the axle or wheel load which is of importance in limitation of weight, and not the gross weight of the truck; for, no matter what the total weight of the vehicle, there is no additional stress on the road if the wheel or axle load is not excessive and there is a space of 40 inches between axles. For this reason, there is no reason for limiting gross load on such roads to 20,000 pounds, and likewise no reason for considering the tractor-semitrailer combination as one vehicle for the purpose of applying the weight limitation. Only five states of the Union limit the gross weight of vehicles to 20,000 pounds, viz., South Carolina, Tennessee, Alabama, Mississippi, and Texas.

■ It is argued that on the roads which are paved with standard pavement there are some bridges which were constructed for a maximum ten ton load; but it appears that these bridges were constructed to bear a series of ten ton trucks going in opposite directions across the bridge (and the tractor-semitrailer combination imposes no more stress than one truck following another); that they have been strengthened to bear the increasingly heavy traffic; and that the heavy trucks of interstate commerce have been using them at least since 1930, when the law permitted a gross weight of 40,000 pounds in a truck trailer combination. As a result of the injunction in the Nutt case these bridges, as well as the standard pavement roads, have been used by the traffic which would be excluded by the act of 1933 without substantial injury. It is true, however, that some of these bridges were not constructed to bear the heavy loads of modern traffic; and as to such bridges the load limitation of the statute cannot be held unreasonable, and our injunctive order will not protect plaintiffs in the use

of such bridges where they have been properly marked with notices forbidding their use by trucks not complying with the statutory requirements.

It is likewise argued that even where the roads are of standard construction, this construction has not been used in some of the town and city streets which are a part of the roads; and that the load limitation of the statute is a reasonable one for the protection of these streets. There is no showing, however, that there has been substantial damage to any streets as a result of the heavy traffic which has been passing over them for the past five years, and no reasonable ground to apprehend such damage in the future. And, even if this were not true, a regulation which would in effect drive a vitally important part of interstate commerce from 2,400 miles of road capable of sustaining it, because there are a few weak streets at various places in the system, is a patently unreasonable regulation. A system of highways of 2,400 miles is a substantial system. When it has been designed for the accommodation of traffic of the character carried on by the interstate motor carriers, it is unreasonable to withhold the entire system from the use of such traffic because of a few weak links, which, if injured by the traffic, can be repaired at comparatively slight expense.

So far as the width of the trucks is concerned, it appears that 96 inches is the standard width of the trucks now used in long distance hauling and engaged in interstate commerce, that 85 per cent. of the trucks manufactured for long distance hauling are of that width; and that South Carolina is the only state in the Union which limits the width of trucks using its roads to 90 inches. As this limitation would bar from the roads many of the trucks engaged in interstate commerce, and as the standard pavement roads, with the exception of about 100 miles, are 18 to 20 feet in width and furnish ample space for the safe operation of such standard width trucks, the limitation seems clearly an unreasonable one to apply to these roads.

It must be remembered in this connection that this splendid system of highways was constructed to bear the traffic developed by modern conditions; and, because it was realized that such a system would furnish highways for interstate commerce which would facilitate the growth and development of the nation, the Federal Government has supplied to the state of South Carolina funds for their construction amounting to $29,000,000, which has been used for that purpose. While the fact that the federal government has aided in the construction of the highways does not, of course, detract from the power of the state to regulate and control them (Morris v. Duby, 274 U.S. 135, 143, 47 S.Ct. 548, 549, 71 L.Ed. 966), it is, we think, a circumstance which should be considered in passing upon the reasonableness of a state statute the effect of which would be to drive an important part of interstate commerce from the highways and withdraw them to that extent from the use for which they were intended and for which the federal aid was granted. The purpose of this aid in the development of interstate commerce was referred to by the Supreme Court in Nashville, etc., R. Co. v. Walters, 294 U.S. 405, 417, 55 S.Ct. 486, 489, 79 L.Ed. 949. In that case the court said of the highways of Tennessee, what is true of these federal-aid highways of South Carolina:

"The state highways of Tennessee (as distinguished from county and city roads and turnpikes) have their origin in the federal aid highway legislation. The aim of that legislation is 'a connected system of roads for the whole Nation'; 'to provide complete and economical highway transport throughout the Nation'; to furnish 'a new means of transportation, no less important to the country as a whole than that offered by the railroads'; to establish 'lines of motor traffic in interstate commerce.' The immediate interest of the federal government is, in part, the national defense as well as the transportation of the mails. The relief of the unemployment incident to the business depression has been the main incentive for highway construction since April 4, 1930, the period in which the highway here in question was undertaken and completed.

"To achieve its purposes, the federal government has made large contributions to the cost of the federal aid highway system. In each year, it has made to each state grants in money, proportioned according to various factors, to be expended in defraying up to one-half the cost of constructing therein the designated highways. In addition, it has, through

the War Department, allotted to the several states their pro rata shares of surplus war equipment and supplies valued at more than $224,000,000. It has at all times given to the several states the benefit of its economic and physical research; and other aid by its experts and administrators. It has since the depression, given to the several states emergency grants to be expended in highway construction for the relief of unemployment. In the fiscal years ending June 30, 1931, 1932, and 1933, during which this highway was authorized and completed, Tennessee received from the federal government, for the highway system, in cash, $11,063,325; and at the close of that period practically the entire expense of building federal aid roads in the state was being borne by the federal government.

"The Secretary of Agriculture, acting through the Federal Bureau of Public Roads, has determined in large measure, not only the location of the federal aid highways in the several states, but also their character and their incidents. Early legislation provided that: 'The Secretary of Agriculture and the State highway department of each State shall agree upon the roads to be constructed therein and the character and method of construction.' The Act of 1921 required each state to select and submit to the Secretary, for approval as the object of future federal aid expenditures, 'a system of highways not to exceed 7 per centum of the total highway mileage of such State'; the system was to 'be divided into two classes, one of which shall be known as primary or interstate highways, * * * and the other which shall connect or correlate therewith and be known as secondary or intercounty highways.' Congress transferred to the Secretary the powers and duties in relation to highways and highway transport originally conferred upon the Council of National Defense. The War Plans Division of the General Staff and Corps of Engineers of the War Department promptly co-operated with the Bureau of Public Roads 'in a study the purpose of which is the selection of those highways which are important from a military standpoint.'

"Upon the Secretary devolves the duty of prescribing needful rules and regulations, including such recommendations as he might deem necessary for 'insuring the safety of traffic on the highways.' "

And as bearing upon the reasonableness of regulations which would thus burden and hamper interstate commerce by truck, and in effect drive much of it from the roads of the state, we must consider the experience of other states and the judgment of those having special knowledge with respect to dealing with size and weight of vehicles using the highways. In this connection we find that the proposed Uniform Act Regulating Traffic on Highways to which we have heretofore referred, published by the Bureau of Roads of the United States Department of Agriculture in 1934, and drafted by the National Conference on Street and Highway Safety in the Department of Commerce, provides a width of 8 feet for motor vehicles, a wheel load of 8,000 and an axle load of 16,000 pounds with high pressure pneumatic tires, and a wheel load of 9,000 and an axle load of 18,000 pounds with low pressure tires. The following organizations co-operated in the conference in which this proposed uniform act was drafted, viz.: Bureau of Public Roads, United States Department of Agriculture; American Association of Motor Vehicle Administrators; American Automobile Association; American Mutual Alliance; American Railway Association; American Transit Association; Chamber of Commerce of the United States; National Automobile Chamber of Commerce; National Bureau of Casualty and Surety Underwriters; and National Safety Council. Practically the same recommendations with respect to size and weight, and identically the same as to the matters here under consideration, were made by the American Association of State Highway Officials in convention at Washington November 17, 1932; and these have been approved by the following groups: American Automobile Association; American Farm Bureau Federation; American Motorists Association; American Petroleum Institute; Automobile Manufacturers Association; Detroit Board of Commerce; National Association of Motor Bus Operators; National Grange; National Highway Users Conference; National Industrial Traffic League; National Transportation Committee; and Rubber Manufacturers Association.

The American Association of State Highway Officials in its publication "Who Shall Use the Highways and How," in addition to making the foregoing recommen-

dation as to size and axle weights, says: "Highway stresses are ruled by *wheel loads* and not by *gross loads*," and "so far as road surfaces are concerned, the limitation of axle or wheel loads gives full protection, let gross loads be what they may." For protection of bridges it recommends that gross weight be fixed by the formula $W = C$ (L plus 40), where W represents total gross weight, L the distance in feet between the first and last axles of a vehicle or combination of vehicles, and C a coefficient to be determined by the individual states. For this coefficient a minimum of 700 is recommended. Under this recommendation the minimum gross weight limit could hardly be less than 35,000 pounds.

The law applicable to the situation is, we think, reasonably clear. There can be no doubt as to the power of the state to prescribe reasonable regulations limiting the size and weight of vehicles upon its highways, both for the sake of preserving the highways themselves and for the protection of the public using them. There is a broad range of legislative discretion with respect to such matters, and legislation is not to be condemned merely because the courts may not agree as to its wisdom. Sproles v. Binford, 286 U.S. 374, 388, 52 S.Ct. 581, 585, 76 L.Ed. 1167; Morris v. Duby, 274 U.S. 135, 47 S.Ct. 548, 71 L.Ed. 966. But as indicated by the court in the case last cited (274 U.S. 135, at page 145, 47 S.Ct. 548, 550, 71 L.Ed. 966), such regulation must not be so arbitrary and unreasonable as to defeat the useful purposes for which Congress has made its large contribution toward the building of the highways. In other words, the states in the exercise of their inherent police power may regulate the use of the highways for the protection of the highways themselves and the safety of the public using them, and certainly in the absence of legislation by Congress may make such regulation applicable to interstate as well as intrastate traffic; but they may not adopt arbitrary regulations, not reasonably necessary for the protection of the highways or of the public, which will directly burden interstate commerce, even though such regulations may not discriminate as between commerce which is interstate and that which is not. As was well said by Mr. Justice Strong in Hannibal & St. J. Railroad Co. v. Husen, 95 U.S. 465, 473–474, 24 L.Ed. 527: "The police power of a State cannot obstruct foreign commerce or interstate commerce beyond the necessity for its exercise; and under color of it objects not within its scope cannot be secured at the expense of the protection afforded by the Federal Constitution. And as its range sometimes comes very near to the field committed by the Constitution to Congress, it is the duty of the courts to guard vigilantly against any needless intrusion."

Under our dual governmental system, the control of the highways is committed to the states, whereas the control of interstate commerce passing over those highways is committed to the Federal Government; and since the decision in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23, it has been settled that the states may not in their control of the highways burden or interfere with the free flow of interstate commerce, the regulation of which has been intrusted to Congress. This would not be doubted if the highway in question were a navigable river, but the principle is the same whatever the character of the highway over which the interstate commerce moves. Thus, the federal power extends over artificial waterways constructed by the states (Ex Parte Boyer, 109 U.S. 629, 632, 3 S.Ct. 434, 27 L.Ed. 1056), and over a railroad handling cars moving in interstate commerce, although the railroad has been constructed and is being operated by one of the states (U. S. v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567). And when a state builds a road as a highway of commerce, it cannot burden the flow over it of commerce interstate in character. Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286. As said by Mr. Justice Brewer in Re Debs, 158 U.S. 564, 590, 15 S.Ct. 900, 909, 39 L.Ed. 1092:

"Up to a recent date, commerce, both interstate and international, was chiefly by water, and it is not strange that both the legislation of congress and the cases in the courts have been principally concerned therewith. The fact that in recent years interstate commerce has come to be carried on mainly by railroads and over artificial highways has in no manner narrowed the scope of the constitutional provision, or abridged the power of congress

over such commerce. On the contrary, the same fullness of control exists in the one case as in the other, and the same power to remove obstructions from the one as from the other.

"Constitutional provisions do not change, but their operation extends to new matters, as the modes of business and the habits of life of the people vary with each succeeding generation. The law of the common carrier is the same to-day as when transportation on land was by coach and wagon, and on water by canal boat and sailing vessel, yet in its actual operation it touches and regulates transportation by modes then unknown—the railroad train and the steamship. Just so is it with the grant to the national government of power over interstate commerce. The constitution has not changed. The power is the same. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop."

We have given careful consideration to what was said in Morris v. Duby and Sproles v. Binford, supra, and were at first inclined to think that these decisions were conclusive of the case before us. Upon more mature consideration, we do not think this is correct. It is true that in Morris v. Duby, a state statute prescribing a maximum load weight of 16,500 pounds was upheld, and in Sproles v. Binford, one prescribing a net load of 7,000 pounds; but in neither of these cases was there any such showing of the unreasonableness of the limitation and of the direct burden upon interstate commerce when applied to a system of standard concrete roads as is contained in the record before us. The same is true of State v. Nutt, supra. In Sproles v. Binford, the court commented on the fact (at page 385 of 286 U.S., 52 S.Ct. 581, 583, 76 L.Ed. 1167) that the roads capable of carrying a greater load than the maximum permitted by the statute did not form a regularly connected system and were scattered throughout the state and that the operations of complainant were conducted over all types of highways and bridges. Here we have a connected system of standard highways of the finest character; and there is no reasonable relation between the limitations complained of and the preservation or safety of such highways. In the light of experience and of scientific knowledge, there is no ground for reasonable difference of opinion as to the gross load limitation of 20,000 pounds not being necessary for the protection of such roads themselves, and there is even less justification for the requirement that the tractor-semitrailer combination be counted one unit for the purpose of computing gross load. So far as safety is concerned, the evidence shows clearly that there is less danger to traffic from the standard trucks of interstate commerce than from smaller trucks carrying a load for which they are not designed; and certainly there is not enough advantage in a 90 over a 96 inch width to justify the exclusion from an 18 or 20 foot highway of trucks of a width permitted by all other states of the Union. It is true that the enforcement of the provisions of the statute would probably reduce traffic on the highways to the extent that it would greatly reduce the amount of long distance hauling by truck, but it would do this by placing a direct burden on the interstate commerce now using such highways; and as the highways were constructed to carry such commerce and there is no evidence that the traffic has become so dense as to be a menace to the safety of persons using them, there is no justification for burdening interstate commerce to achieve such a result.

There is another angle from which the reasonableness of police regulations burdening interstate commerce in this way must be judged. Not only has Congress aided in the construction of the roads so that they may become highways of such commerce, but in the enactment of the motor carriers' act, it has recognized truck traffic as a legitimate part of that commerce essential to the welfare of the public and subject to regulation for that reason. As said of Federal aid legislation in Bush & Sons Co. v. Maloy, 267 U.S. 317, 324, 45 S.Ct. 326, 327, 69 L. Ed. 627, this legislation regulating motor carriers is of significance because it makes clear the purpose of Congress that state highways shall be open to commerce of that character. Congress has not attempted to regulate size and weight and there are great practical difficulties in the way of such regulation by Congress. It is of great importance, therefore, that regulation of this matter by the states be held

within reasonable bounds, and that they be not permitted, under guise of exercising the police power, to exclude from their highways by unreasonable regulations the interstate commerce which Congress is regulating in the public interest and for the carrying of which it has aided in the construction of roads that form parts of a great national system of highways.

As to highways of the state, other than those which have been paved with standard concrete or standard concrete and asphalt paving, we cannot say that the provisions of the act are unreasonable; · and there is no basis upon which an injunction should issue enjoining the enforcement of the act so far as they are concerned. As to them the principles laid down in Morris v. Duby and Sproles v. Binford are applicable. The same is true of bridges which have not been constructed for carrying the heavy trucks of modern traffic, even though they may be located on standard highways. If there were a great many of these, their presence would justify the application of the act to the entire system of highways, but the evidence shows that they are comparatively few in number; and interstate commerce, or at least a large part of it, could be so routed as to avoid them entirely. We think, however, that where it is the intention of the defendant to enforce the provisions of the act with respect to any bridge on the roads constituting the arteries of interstate commerce to which we have referred, or on other roads paved with standard concrete paving, notices to that effect should be posted on both sides of the bridge, of sufficient size and character to give ample warning that the use of the bridge is forbidden to trucks with a gross weight in excess of 10 tons or of a width exceeding 90 inches. As the bridges in question are probably capable of carrying the traffic as they have been carrying it for the past five years, we feel justified in enjoining the enforcement of the act as to them unless notice is posted as herein indicated. And in order that the use of bridges may not be unreasonably denied to plaintiffs, and that no hardship may result from the enforcement of our injunctive order with respect to contingencies which may arise and which we are not able now to foresee, we will retain jurisdiction of the cause to the end that the injunctive order. may be modified as occasion for such modification may arise.

We are not to be understood as holding that the federal courts possess any regulatory power over the states in the control of the roads. So long as that control is exercised so as not to interfere unreasonably with interstate commerce, the courts have no power to interfere. Any regulation limiting size and weight, having reasonable relation to the preservation of the highways or the safety of persons using them, must be upheld; and we do not doubt the power of the states, in the reasonable exercise of the police power, to bar certain types of vehicles entirely from their roads, or entirely to forbid the use of trucks on certain of the roads provided other roads are available for the use of traffic of this character. But we do not think that the state may erect a Chinese wall around itself by adopting regulations the effect of which would be to bar a large part of interstate traffic from all of its highways when such regulations have no reasonable relation to their safety or preservation. A gross load limit of 20,000 pounds, as we have seen, has no reasonable relation to either safety or preservation of the standard highway, the provision for counting the tractor-semitrailer combination as one unit for applying the gross load limitation has even less to commend it, and the 90-inch width limitation, while doubtless reasonable when viewed in vacuo, cannot be defended in view of the fact that all other states permit the standard width of 96 inches and the only practical effect of the 90-inch limitation is to close the roads to a large part of interstate traffic. It must not be forgotten that the roads, in the final analysis, belong to the people. They are held by the states in trust for the people, who are entitled to make a reasonable use of them. Use for the purposes of interstate transportation is a reasonable use, the control of which the people have vested in the federal government; the states may not unreasonably interfere with such use; and an interference, not necessary to the safety or protection of the roads, which burdens interstate commerce and excludes a large part of it from using the roads, must be condemned as unreasonable. The highways of interstate commerce must not be unreasonably obstructed by the states, whether they be natural highways such

as rivers, or whether they be artificial highways which the people themselves have constructed and dedicated to the purposes of commerce.

We have considered the argument that the agricultural interests of the state are served by the trucks which come to the fields for the delivery of fertilizer and the collection of vegetables for market, and we realize that this involves the use of roads other than the standard concrete highways; but we cannot say that the statute is unreasonable as applied to such roads. The argument that the number of heavy trucks using such roads is few, and the damage to them from such occasional use is inconsequential, is a matter for the consideration of the State Legislature. Only with respect to the highways specifically mentioned and those federal-aid highways of standard concrete or standard concrete and asphalt construction can we pronounce the provisions of the act unreasonable; and only as to them will its enforcement be enjoined as an unreasonable burden on interstate commerce.

Decree accordingly.