MAURER et al., TRADING AS MAURER & MYERS
AUTO CONVOY, v. HAMILTON, SECRETARY OF
REVENUE OF PENNSYLVANIA, et al.

No. 380.   Argued February 2, 1940.   Reargued March 27, 28,
1940.—Decided April 22, 1940.

*Messrs. Sterling G. McNees* and *Edmund M. Brady*, with whom *Mr. Gilbert Nurick* was on the brief, on the reargument and on the original argument, for appellants.

*Mr. George W. Keitel*, Assistant Deputy Attorney General of Pennsylvania, with whom *Mr. Claude T. Reno*, Attorney General, was on the brief, on the reargument and on the original argument, for appellees.

By leave of Court, *Solicitor General Biddle* and *Messrs. E. M. Reidy, Edwin L. Huddleson, Jr.,* and *Daniel W. Knowlton* filed a brief on behalf of the United States et al., as *amici curiae*, urging reversal.

MR. JUSTICE STONE delivered the opinion of the Court.

The question for decision is whether a statute of Pennsylvania prohibiting the operation over its highways of any motor vehicle carrying any other vehicle over the head of the operator of such carrier vehicle, is superseded by the rules and regulations promulgated by the Interstate Commerce Commission under the Motor Carrier Act of 1935, 49 Stat. 543, 49 U. S. C. §§ 301–327, applicable to common and contract carriers in interstate commerce.

Appellants, co-partners engaged as common carriers in the business of transporting in interstate commerce new

automobiles upon motor trucks specially constructed for that purpose, brought this suit in the Pennsylvania state courts to enjoin appellees, state officers, from enforcing against appellants § 1033(c) of the Pennsylvania Vehicle Code, effective June 29, 1937, 75 P. S. 642, which prohibits the operation on the highways of the state of any vehicle carrying any other vehicle "above the cab of the carrier vehicle or over the head of the operator of such carrier vehicle." [1] Two other like suits brought by motor carriers engaged in like transportation interstate were consolidated with the present suit.

After a hearing in which there was extensive evidence tending to show that the transportation by appellants over the state highways of cars placed above the cab of the transporting vehicle is unsafe to the driver and to the public, the trial court found that the location of motor vehicles over the cab of the carrier rendered its operation dangerous on the curves and grades of the Pennsylvania

[1] "(c) No person shall operate a vehicle on the highways of this Commonwealth carrying any other vehicle, any part of which is above the cab of the carrier vehicle or over the head of the operator of such carrier vehicle."

After the argument of the appeal in this case, but before the decree in the State Supreme Court, this section was amended to read:

"(c) No person shall operate a vehicle on the highways of this Commonwealth carrying any other vehicle, the weight of which is directly above the cab of the carrier vehicle or directly over the head of the operator of such carrier vehicle." Act No. 400 of June 27, 1939.

The Supreme Court of Pennsylvania, in its opinion, considered this amendment and concluded that the statute both before and after the amendment applied to the vehicles used by appellants and was directed at the same evils, and that no essential change was made by the amendment, a construction which we adopt. The Supreme Court also concluded that as the amendment named no date when it was to take effect it would become effective some two months later, on September 1, 1939, as provided by § 4 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 1020.

highways. It found that such location of the carried car above the driver raises the center of gravity of the loaded car above that which is normal in trucking operations, places excessive weight on the front axles and tires, obscures the vision of the driver of the carrier car, with the results that it increases the difficulty of steering the loaded car, adversely affects braking, particularly on curves, and affects the balance of the loaded car so as to make its use on the highways dangerous.

It also found that in case of collision or loss of control the overhead car has a tendency to fly off the cab, in consequence of which, in numerous cases, serious injury had resulted to the operator of the truck or to the colliding car and its occupants, or both, and that the height of the overhead car and its interference with the driver's vision causes him to drive on the wrong side of the road in order to avoid overhead obstructions. The court concluded that the state statute was a safety regulation of motorcars using the highways of the state and that, as applied to appellants, it infringed neither the commerce clause of the Federal Constitution nor the due process clause of the Fourteenth Amendment, and gave judgment dismissing the complaint. On appeal the Supreme Court of Pennsylvania confirmed the findings of the trial court and affirmed the decree. 336 Pa. 17; 7 A. 2d 466. The case comes here on appeal under § 237 of the Judicial Code, as amended, 28 U. S. C. § 344.

Before the present suit was brought, the Interstate Commerce Commission, purporting to act under the Motor Carrier Act, had promulgated regulations effective July 1, 1936, with respect to "safety of operation and equipment" of common and contract motor carriers in interstate commerce, subject to the Act. These regulations contained no provisions specifically applicable to cars carried over the cab of the carrier vehicle. On March 11, 1939, while the present cause was pending be-

fore the Supreme Court of Pennsylvania, the Interstate Commerce Commission, in "Car Over Cab Operations," 12 M. C. C. 127, issued its report of an investigation of the practice of the car over cab method of transportation of motor vehicles, in which it announced its conclusion that

"The record discloses no testimony whatsoever to show that the operation of motor vehicles, used in transporting new automobiles, and which are so constructed that one of the automobiles being transported extends in whole or in part over the cab, is unsafe. On the contrary, the evidence is clear that the average number of accidents in which vehicles of this type are involved is less than the country's average for all trucks. We find no reasons of record why the operations of such vehicles should be forbidden. The safety regulations heretofore prescribed by us, of course, apply to these as well as other vehicles operated by common and contract carriers in interstate or foreign commerce. The operations of vehicles so equipped are therefore permitted by the existing regulations, and there is no need for change." (p. 132.)[2]

---

[2] The report of the Interstate Commerce Commission states, page 133, that in this proceeding "the only evidence was introduced by or on behalf of carriers engaged in the type of operation under investigation," that the State of Pennsylvania declined to participate in the proceeding and that a representative of the state invited the attention of the Commission to the evidence which had been taken in the present suit, but that such evidence was not made a part of the record in the proceeding before the Commission and was not considered by it. The Commission, so far as the report discloses, gave no consideration to the consequences of placing the carried car above the cab of the motor carrier when accidents do in fact occur, to the effect of the weight distribution of the combination when used on highways of grades and curves over which petitioners operate in Pennsylvania, and its tendency to cause the driver of the combination to hold to the middle of the road to avoid injury to the carried car on the tree-lined highways of the state, all of which were deemed by the state courts in the present case to have an important bearing on safety.

The Supreme Court of Pennsylvania took judicial notice of this action of the Commission, but concluded that the authority of the state to enact § 1033 (c) of the Vehicle Code was unimpaired by federal action under the commere clause for the reason that the applicable provisions of the Motor Carrier Act, enacted by Congress, did not purport to withdraw from the state its constitutional power to make the regulation embodied in that section, and for a second reason, which we find it unnecessary to consider, that in any case the action of the Commission in declining to adopt any rule or regulation with respect to the car over cab practice of interstate common and contract motor carriers could not be taken as a mandate to such carriers to continue the practice despite state regulation prohibiting it.

Appellants assail the state statute on the grounds that even though it is unaffected by the provisions of the Motor Carrier Act it nevertheless infringes the commerce clause and the due process clause of the Fourteenth Amendment and that in any case the statute is superseded by the action taken by the Commission in conformity to the Motor Carrier Act.

Only a word need be said of the constitutional objections. The present record lays a firm foundation for the exercise of state regulatory power, unless the state has been deprived of that power by Congressional action authorizing the Commission to substitute its judgment for that of the state legislature as to the need and propriety of the state regulation. The nature and extent of the state power, in the absence of Congressional action, to regulate the use of its highways by vehicles engaged in interstate commerce has so recently been considered by this Court that it is unnecessary to review the authorities now, or to restate the standards which define the state power to prescribe regulations adapted to promote safety upon its highways and to insure their conservation

and convenient use by the public. See *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177. Judged by these standards we can find no basis for saying that the Pennsylvania statute is not such a regulation or that it is a denial of due process or that it infringes the commerce clause if Congress has not authorized the Interstate Commerce Commission to promulgate a conflicting rule.

This brings us to the more serious question whether Congress, by the enactment of the Motor Carrier Act of 1935, as a regulation of interstate commerce, has undertaken to deprive the state of the power to impose the present regulation upon vehicles moving in interstate commerce. With the adoption of the Motor Carrier Act, the national government embarked on the regulation of a type of interstate traffic many of whose regulatory problems bear little resemblance to those of other systems of transportation which had previously been subjected to Congressional control. They presented difficulties and complexities differing from and far exceeding those of any earlier regulations of interstate commerce. Our most extensive experience had been in the national regulation of rail carriers, operating over roads and with rolling stock privately owned and controlled, with standards of roadbed, operation and equipment, substantially uniform throughout the country, and with the movement of traffic on each road subject to a single unified control.

Regulation of vehicular traffic over the highways of the United States involves a far more varied and complex undertaking. The highways of the country have been built by the states with substantial financial aid from the federal government in the construction of some of them.[3] They are state owned, and, in general, are open

---

[3] For the significance of federal aid, see hearings before Senate Committee on Interstate Commerce on S. 2793, 72d Cong., 1st Sess. (1932), p. 217. See also *Nashville, C. & St. L. Ry.* v. *Walters,* 294 U. S.

in each state to use by privately owned and controlled motor vehicles of widely different character as respects weight, size, and equipment.[4] The width, grades, curves, weight-bearing capacity, surfacing and overhead obstructions of the highways differ widely in the forty-eight different states and in different sections of each state. There are like variations with respect to congestion of traffic. State regulation, developed over a period of years, has been directed to the safe and convenient use of the highways and their conservation with reference to varying local needs and conditions.

Assumption of national control involved problems of peculiar difficulty and delicacy. Apart from regulations of interstate motor traffic having commercial aims and involving routes, schedules, rates and the like, any regulation on a national scale, whatever its extent, has an intimate and vital relation to the conservation of highways which belong to the states, and to their safe and convenient use by the general public in both interstate and intrastate traffic. Our entire experience with the growth of automobile traffic and its regulation by the states teaches that in any form of non-commercial regulation, safety is a dominant consideration. Motor vehicles are dangerous machines whose operation is attended by serious hazard to persons and property. *Hess* v. *Pawloski*, 274 U. S. 352, 356. In 1934, the year before the enactment of the Motor Carrier Act, there were 36,000 reported deaths from motorcar accidents in the United States.[5] Excessive speed, defective appliances,

---

[4] It is estimated that 85 per cent of all trucks are privately owned and operated, and that over 200,000 separate trucks would be subject to the federal regulation. See Hearings before Senate Committee on Interstate Commerce on S. 2793, 72d Cong., 1st Sess., p. 223; S. Doc. 152, 73d Cong., 2d Sess., p. 28 (1934); Hearings before House Committee on Interstate and Foreign Commerce on H. R. 5262, 74th Cong., 1st Sess. (1935), p. 156, *et seq.*

[5] Accident Facts (1936) published by National Safety Counsel, Inc.

negligent driving, size, weight and loading of cars in conjunction with local conditions of traffic and of the highways, contributed in varying degrees to this record of disaster.

It is in the light of this history and background that we must appraise and apply the provisions of the Motor Carrier Act of 1935. The declared policy of the Act, § 202 (a), is to preserve and foster the economic and commercial advantages of an efficient transportation system. The power to regulate, which it confers on the Interstate Commerce Commission, extends in some measure to safety regulations. Section 204 (a) provides:

"It shall be the duty of the Commission—(1) To regulate common carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment."

Subdivision (2) imposes a like duty upon the Commission to regulate "contract carriers." Subdivision (3) imposes the duty.

"To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment."

Section 225 provides:

"The Commission is hereby authorized to investigate and report on the need for Federal regulation of the sizes and weight of motor vehicles and combinations of motor vehicles and of the qualifications and maximum hours of

service of employees of all motor carriers and private carriers of property by motor vehicle; . . ."

The words of this section indicate, as its history demonstrates, that it was intended to reserve from the regulatory power of the Commission the regulation of "sizes and weight of motor vehicles." Unlike § 204 (a) (3), which makes it the duty of the Commission "if need therefor is found" to establish reasonable requirements to promote safety of operation and to prescribe standards of equipment for "private carriers of property," § 225 imposes no duty and confers no authority on the Commission to regulate the sizes and weights of motor vehicles.[6] Its authority is limited to investigation and report of the need of such regulation.[7]

The bill containing the provisions of §§ 204 and 225 which we have quoted, was prepared by the Federal Coordinator of Transportation and its adoption was recommended in his 1934 report to the Interstate Com-

---

[6] Cf. Coordination of Motor Transportation, 182 I. C. C. 263, 387, Recommendation 11.

[7] On November 8, 1937, the Commission ordered an Investigation

"IN THE MATTER OF REGULATIONS GOVERNING THE SIZES AND WEIGHT OF MOTOR VEHICLES AND COMBINATION OF MOTOR VEHICLES USED BY COMMON AND CONTRACT CARRIERS . . . AND PRIVATE CARRIERS. . . .

"1. To enable the Commission to make a report under the provisions of section 225 on the need for Federal regulation of the sizes and weight of motor vehicles and combinations thereof.

"2. To enable the Commission to prescribe reasonable requirements under the provisions of section 204 of the act as to the sizes and weight of motor vehicles and combinations therefor insofar as they affect the safety of operation."

The Commission is now engaged in making its investigation and has made no report of its findings or conclusions. Report No. 1, a preliminary study as yet unpublished (April, 1940), made by the Bureau of Motor Carriers, Interstate Commerce Commission, is devoted to an analysis of state limitations of sizes and weights of motor vehicles.

merce Commission, which transmitted the report and proposed bill to the Senate with its favorable recommendation. Sen. Doc. No. 152, 73rd Cong., 2d Sess. The report made no mention of the scope, purpose or meaning of § 225, other than the statement, p. 49, that it provides for "investigation and report to Congress of the need, if any, for federal regulation of the sizes and weights of motor vehicles." The report referred, p. 32, to the facts that the states regulate extensively the length, width, height and speed of motor vehicles, and their maximum gross weights and require that they "be equipped with a variety of safety appliances"; that these regulations "are designed in part to protect the safety and convenience of the public in its use of the highways and in part to protect the highways from excessive wear and tear," and that the "requirements as to gross weights, lengths, and widths of vehicles are often grounded in State policies with respect to the design of highways," with respect to their weight sustaining capacity and their curves. In testifying at the hearings upon the bill before the Senate Committee on Interstate Commerce, the Coordinator explained the provisions of § 225 by stating:

"with respect to size and weight of vehicles . . . we do not undertake in this bill to cover that situation except to provide for a thorough investigation of it by the Commission with recommendations to Congress because there is involved not only a question of fact as to what the regulation should be, but also as to how far the federal government has power to interfere with the exercise of the police power of the states with respect to the use of their highways. They have the right to protect their highways against unsafe or unreasonable use, but whether or not the federal government can come in and interfere with it I cannot say at this time." Hearings before

Senate Committee on Interstate Commerce on S. 1629, 74th Cong., 1st Sess., (1935) p. 92.[8]

Again, page 61, he referred to "sizes and weights" as "an extremely important matter from the standpoint of public safety and convenience." This Court has also had occasion to point out that the sizes and weights of automobiles have an important relation to the safe and convenient use of the highways, which are matters of state control. *Sproles* v. *Binford*, 286 U. S. 374; *South Carolina Highway Dept.* v. *Barnwell Bros., supra.* It is evident that the purport of § 225 is to reserve "sizes and weight" from the regulatory powers of the Commission, quite as much when related to safety as when related to highway construction, pending investigation and report by the Commission of the need for such regulation, and further consideration of the matter by Congress. Such has been the uniform construction of § 225 by courts having occasion to consider the subject.[9]

---

[8] On page 61 of the Report the Coordinator stated: "But on this question of sizes and weight of motor vehicles, which is an extremely important matter from the standpoint of public safety and convenience, there is not only the question here as to what those sizes and weights ought to be from the standpoint of road construction and road use, but there is also the legal question as to whether the federal government can exercise power over the matter, or whether it is a matter exclusively within the jurisdiction of the states. It was because of doubts not only as to the facts with reference to that matter, but also to the law that provisions were made for this investigation."

The Committee Reports make no comment on § 225. See S. Rept. No. 482, 74th Cong., 1st Sess.; H. Rept. No. 1645, 74th Cong., 1st Sess.

[9] *L. & L. Freight Lines* v. *Railroad Commission*, 17 F. Supp. 13 (1936); *Barnwell Bros.* v. *South Carolina State Highway Dept.*, 17 F. Supp. 803 (1937); *Werner Transportation Co.* v. *Hughes*, 19 F. Supp. 425 (1937); *Houston & North Texas Freight Lines* v. *Phares*, 19 F. Supp. 420 (1937); *Morrison* v. *State*, 133 Tex. Cr. App. 141; 109 S. W. 2d 205 (1937); *Yellow Cab Transit Co.* v. *Tuck*, 115 S. W.

On the argument before us it was conceded that the "size and weight of motor vehicles," of which § 225 speaks, must be taken to include the sizes and weights of motor vehicles and their loads. This is evident both because an investigation of sizes and weights of motor vehicles, apart from their load, would be useless so far as the major problems of safety and use of the highways are concerned and because, as presently will appear, the state regulation of sizes and weights to be investigated has from the beginning included sizes and weights of the loaded vehicle. The power of the states to regulate the sizes and weights of loaded motor vehicles was thus left undisturbed. Such other courts as have had occasion to consider the matter in the cases already noted have arrived at the same conclusion.[10]

But the question remains whether the Pennsylvania statute is a regulation of "size and weight" within the meaning of § 225, or whether it is a regulation of "safety of operation and equipment," which the Commission was authorized to make by § 204 (1) (2). Perusal of the present record can leave no doubt that in both a technical and a practical sense §. 1033 (c) is a regulation of weight and size of the loaded motor vehicle, and that the Pennsylvania Legislature intended it to be such.[11] By provid-

2d 455 (Tex. Civ. App. 1938); see *H. P. Welch Co.* v. *New Hampshire,* 306 U. S. 79 (1939).

Upon the appeal in *South Carolina Highway Dept.* v. *Barnwell Bros., supra,* to the Supreme Court, respondents abandoned their contention in the trial court that power to regulate the loaded weight and size of motor vehicles had not been withheld from the Commission by § 225. 303 U. S. 177.

[10] See note 9, *supra.*

[11] In addition to subsection (c) of § 1033, which in its amended form is specifically directed to the location of the "weight" of the carried car, the section contains three other subdivisions which affect size and weight distribution of the loaded vehicle. Subsection (a) prohibits the operation of vehicles "having two levels for the carriage

ing that the carried car shall not be loaded above the cab, the statute sets practical limits to the height of the loaded car and precludes its projection beyond the cab of the carrier car and into the line of vision of its driver. It is also a restriction on weight distribution of the loaded car and in its amended form specifically prohibits placing the "weight" of the carried car above the driver.[12] The highest court of the state has declared that such are the purposes of subsection (c), in order to avoid the safety hazards resulting from improper weight distribution and the height of the carried car at a point where it cannot be observed by the driver. As interpreted and applied by the state court, we can not regard the regulation as other than an exercise of the state's power to protect the safe and convenient use of its highways through the control of size and weight of motor vehicles passing over them, which it was the purpose of § 225 to reserve to the state from the grant of regulatory power to the Commission. Being thus reserved we think it is unaffected by the authority conferred on the Commission by § 204 to regulate "safety of operation and equipment."

The Commission in its report in "Car Over Cab Operations," supra, gave no consideration to the extent of its authority under § 204, to make safety regulations affecting the car over cab practice or to the question whether the Pennsylvania restriction is in fact and in practical operation a weight and size regulation, or whether the

---

of other vehicles." Subdivision (b) prohibits operation of vehicles carrying other vehicles any part of which is more than 115 inches from the ground; and subdivision (d) prohibits the operation of vehicles carrying any other vehicle "any axle of which is more than 3 feet higher than any other axle on such carrying vehicle." Subsections (a), (b) and (d) do not become effective until January 1, 1942. West Virginia has a statute containing similar provisions. Ch. 88, Acts of W. Va., 1939.

[12] See note 1, supra.

authority to make such regulations is reserved to the states by § 225. The power of the Commission to regulate with respect to safety in the case of common and contract carriers is defined by § 204(a)(1) and (2), which makes it the duty of the Commission to regulate "safety of operation and equipment." In the exercise of this authority the Commission has made no regulation concerning sizes and weight of motor vehicles or their loads. But in a brief filed in this cause it contends that the Pennsylvania statute is an infringement of the Commission's authority to regulate safety of equipment. In ordinary speech the load of a vehicle is not spoken of as a part of its equipment. In the Motor Carrier Safety Regulations, promulgated by the Commission, safety of equipment is treated as synonymous with or the equivalent of parts and accessories of motor cars affecting safety. The Uniform Act regulating motor car traffic on highways, which was recommended by the National Conference of State and Highway Safety in 1930 and 1934, which was referred to in the report of the Coordinator, placed all size and weight regulations in a single "Article XVI, Size, Weight and Load," separate from the articles containing provisions relating to the speed, driving and movement of motor cars and from "Article XV, Equipment," which was confined to automobile parts and accessories and their inspection.[13]

But even though the phrase "operation and equipment" of motor cars could be taken, when standing alone, as including the weight and size of their loads, we think it plain that it cannot be so taken when read in conjunction with the reservation in §.225 of "sizes and weights" from the regulatory power of the Commission. As the report

---

[13] See Uniform Act Regulating Traffic on Highways, IV, National Conference on Street and Highway Safety (1930), 38, 49; Uniform Act Regulating Traffic on Highways, V, Bureau of Public Roads, United States Department of Agriculture (1934), 23, 35.

of the Coordinator and the leg lation in the several states shows, and as this Court has recognized, see *Sproles* v. *Binford, supra; South Carolina Highway Dept.* v. *Barnwell Bros., supra,* the sizes and weights of motor vehicles and their loads present safety problems which are special and distinct from those involved in the driving and movement of cars ordinarily known as their operation, and from their parts and accessories ordinarily referred to as motor car equipment. As we have seen, one of the purposes of the reservation made in § 225 was to give opportunity for further study and consideration by the Commission of the relation of sizes and weights of motor cars to the public safety and convenience, as well as to road construction and use so that the Commission and Congress might be advised what the regulation of these safety factors should be and how far Congress should interfere with their regulation by the states.

The Couzens bill, S. 2793, § 2 (a) (1) (2), 72d Cong., 1st Sess., discussed in the 1934 report of the Coordinator, authorized the Commission to prescribe reasonable requirements with respect to "safety of operation and equipment (including the weight, length, width and height of motor vehicles used by such carriers)." This proposal was not adopted and in the bill recommended by the Coordinator and the Commission in 1934 and enacted as the Motor Carrier Act of 1935, the parenthetical clause in the provision authorizing regulation of safety of operation and equipment as it appeared in the Couzens bill, was transferred to § 225, where it appeared as "sizes and weight of motor vehicles," federal regulation of which was reserved to await the future action of Congress. The clause which was thus resorted to in the earlier bill to include regulations of sizes and weight in the authority to regulate "safety of operation and equipment" was by its transfer to § 225 of the Act of 1935 similarly made the means of withholding from the regulatory power of the Commission regulations of sizes and weight affecting safety.

As a matter of statutory construction Congressional intention to displace local laws in the exercise of the commerce power is not, in general, to be inferred unless clearly indicated by those considerations which are persuasive of the statutory purpose. This is especially the case when public safety and health are concerned. *Kelly* v. *Washington,* 302 U. S. 1, 10–14; *H. P. Welch Co.* v. *New Hampshire,* 306 U. S. 79, 85 and cases cited. There are other cogent reasons why the reservation made by § 225 cannot be given a narrow construction. The hesitancy manifested by Congress, until the adoption of the 1935 Act, to interfere with the state highway regulations and its failure then to follow earlier and more far-reaching proposals are persuasive against such a construction.[14] A thorough investigation by the Commission which the statute authorized was necessary not only to determine the importance of sizes and weight "from the standpoint of public safety and convenience," but also to resolve the uncertainty of the draftsmen of the bill and presumably of Congress "as to the facts with reference to the matter" and "as to what the regulation should be." S. Doc. No. 152, 73rd Cong., 2d Sess., p. 61. The extent to which Congress should, if at

---

[14] Prior to the 70th Congress, the bills for federal regulation contained no provisions of any kind relating to size and weight. Beginning with the 70th Congress the bills almost uniformly provided that interstate carriers should remain subject to state regulations relating "to the maintenance, protection, safety, or use of the highways therein, which do not discriminate against motor vehicles used in interstate commerce." The Rayburn bill which the Interstate Commerce Commission approved, contained such a clause (S. Doc. 152, 73d Cong., 2nd Sess., 25). Only the Couzens bill (S. 2793, 72d Cong., 1st Sess.) affirmatively prescribed federal regulation. The Dill bill (S. 3171, 73d Cong., 2d Sess.) and S. 1629, 74th Cong., 1st Sess., which was finally enacted as the Motor Carrier Act, envisaged the possibility of such regulation of size and weights but only after a report to Congress. For a discussion of these bills see Kauper, Federal Regulation of Motor Carriers, 33 Mich. L. Rev. 239, 240–243, notes 128, 129, 132.

all, curtail state regulation, could be determined only when those doubts were resolved.

A considerable period of time was required for preparation for the investigation and for bringing it to a conclusion. The investigation which was authorized in November 1937, Ex parte No. M. C. 15, has not yet proceeded beyond the preliminary stage of gathering information. It could not be assumed that in the meantime a rapidly changing industry would not produce new types of vehicles involving new problems of the relation of sizes and weight to safety such as are involved in the present case. A construction of the reservation made in § 225 is not to be favored which would deprive the states of authority to make safety regulations of sizes and weight before Congress was informed by a full investigation and report of the Commission of the nature of the regulations, both those in force and those which are needed, and whether in the light of the competing demands for national uniformity and for accommodation to local conditions, regulation of sizes and weight can be best prescribed by the Commission, by the state legislatures, or by a divided authority. For these reasons we think that the reservation of state power by § 225 is not restricted to the particular problems of weight and size which the traffic had developed at the moment when the act was passed, or which were then known to the Commission, in advance of the investigation which was to ascertain the facts, what the regulation should be and how far regulations of sizes and weights should be withdrawn from the states.

Sizes and weights which affect safety, not excluding consideration of local conditions, as well as those which affect wear and tear of the highways were to be the subject of investigation, and it is the subject of investigation which defines the reservation from the Commission's authority to regulate. Hence the phrase "sizes and weight" in § 225, when safety is concerned, is not to be

narrowly limited to the overall length, width and height of the loaded cars and to their gross weight. For as we have seen, distribution of weight and dimensions of load or particular parts of it in connection with local conditions of curves, grades and overhead obstruction of the highways, have an important relation to safety. In the light of the investigation Congress might conclude that the regulation of gross weights and dimensions, concededly left to the states, could not be conveniently or wisely separated from regulation of weight distribution and particular dimensions.

It is true that the report of the Coordinator presenting the bill for Congressional action particularized gross weight and overall dimensions as a common subject of regulation by the states and as a reason for making the investigation. But we find nothing in the report, or in his testimony before the Senate Committee, or elsewhere in the legislative history, to show that it was intended by § 225 to confine state power to regulation of sizes and weights of automobiles and their loads to gross weights and overall dimensions. The bill as proposed and as enacted did not specify any such limitation of "sizes and weight," and it was well known that state size and weight regulations then in force or proposed were not so restricted.

Schedule B of the 1934 report of the Coordinator disclosed, page 213, that state regulation was then concerned with distribution of load weight by axle and wheel weight requirements. The weight provisions of the Uniform Act proposed by the National Conference on State and Highway Safety in 1930 and 1934, contained gross weight limitations, and axle weight limitations which involved distribution of weight of the loaded car. The preliminary report (No. 1) of the Interstate Commerce Commission, Bureau of Motor Carriers of April, 1940, p. 71, notes various state regulations fixing axle weight or wheel weight limitations, sometimes with and sometimes with-

out a gross weight limitation, and states that the combination of these factors "is basically intended to control not only total gross weight of the vehicle and its load but also distribution of the load on the vehicle."

The proposed Uniform Act also contained provisions, in "Article XVI, Size, Weight and Load" (§ 78 (e) of the 1930 Draft; § 142 (d) of the 1934 Draft), for the distribution or location of load and its particular dimensions, independently of gross weight and overall measurements. They directed that "the load upon any vehicle . . . shall not extend more than three feet beyond the front wheels of such vehicle or the front bumper of such vehicle if it is equipped with such a bumper." Report No. 1 of the Commission indicates that this provision has been adopted in twenty-three states and that three states prohibit any such projection of load. As already noted, the present Pennsylvania statute regulating car over cab operation has been enacted in substance in West Virginia.[15]

. Reading the words of § 225 in the light of its legislative history, and mindful of the peculiar conditions of the traffic and the problems of state regulation to which the section must be applied, and of its obvious purpose to postpone until the report of the Commission determination of the extent to which Congress should withdraw from the states their power to regulate sizes and weight of motor vehicles, we cannot say that the phrase as used in the statute is restricted to overall measurements or gross weight, or that it does not include particular dimensions of motor vehicles and their loads and the distribution of load, which affect safety as well as the wear and tear of the highways. We conclude that the Pennsylvania statute now before us is a weight and size regulation within the meaning of § 225, and is within the regulatory authority of the state reserved by that section from the authority granted to the Commission by § 204.

*Affirmed.*

[15] See note 11, *supra*.