NAVAJO FREIGHT LINES, Inc., a New
Mexico corporation,

Ringsby Truck Lines, Inc., a Nebraska
corporation,

Prucka Transportation, Inc., a Nebraska
corporation,

Denver Chicago Trucking Co., Inc., a
Nebraska corporation,

Watson Bros. Transportation Co., Inc.,
a Nebraska corporation, and

Pacific Intermountain Express Co., a
Nevada corporation, Plaintiffs,

and

Arkansas-Best Freight System, Inc., an
Arkansas corporation, Intervenor,

v.

Joseph D. BIBB, Director of the Department of Public Safety of the State
of Illinois,

and

William H. Morris, Superintendent of the
Division of State Highway Police, Department of Public Safety of the State
of Illinois, Defendants.

Civ. A. No. 2438.

United States District Court
S. D. Illinois, S. D.

Feb. 26, 1958.

Axelrod, Goodman & Steiner, Chicago, Ill., for plaintiffs.

Mack Stephenson and Melvin N. Routman, Springfield, Ill., Harper, Harper & Young, Fort Smith, Ark., for Arkansas Best-Freight Lines, Inc., intervenor.

Latham Castle, Atty. Gen., by Richard W. Husted, Asst. Atty. Gen., for defendants.

Before MAJOR, Circuit Judge, and BRIGGLE and MERCER, District Judges.

MAJOR, Circuit Judge.

Plaintiffs instituted this proceeding, praying for a declaratory judgment that Sec. 121.02 of the Uniform Act Regulating Traffic on Highways, being Sec. 218 b of Chap. 95½, as amended (Ill.Rev. Stat.), effective July 8, 1957 (hereinafter referred to as the Act), be held unconstitutional and void, and that defendants be enjoined from enforcing or instituting proceedings against plaintiffs under the Act. Arkansas-Best Freight System, Inc., was granted leave to intervene. The District Court issued a temporary restraining order.

On January 15, 1958, a three-judge Court was convened in accordance with the requirements of Title 28 U.S.C.A. Sec. 2284. On January 15 and 16, 1958, the Court heard testimony offered by the respective parties, as well as argument of counsel, at the conclusion of which the matter was taken under advisement.

The Act under attack, entitled "Rear fender splash guards," provides:

"It is unlawful for any person to operate any motor vehicle * * * upon the highways of this state * * * unless such vehicle is equipped with rear fender splash guards which shall comply with the specifications hereinafter provided in this Section * * *."

The specifications require that the splash guards (1) contour the wheel; (2) cover the top 90° of the rear 180° (excepting vehicles of less than five inches clearance, and requiring that they contour within two inches of the body); (3) extend downward to within ten inches of the ground; (4) have a lip or flange of two inches upon the outside edge, and (5) retain its general parallel condition under all operating conditions when mounted as required by the statute not more than six inches from the tread when fully loaded.

Plaintiffs named in the caption are all corporations organized and existing under laws of states other than Illinois. They are all engaged in the transportation of property by motor vehicle as a common carrier in interstate commerce generally over regular routes. They all operate pursuant to a certificate of public convenience and necessity issued by the Interstate Commerce Commission. None of plaintiffs other than Watson Bros. render any intrastate transportation in Illinois and hold no authority from the Illinois Commerce Commission to operate in such commerce. Watson Bros. operates to a limited extent in intrastate commerce in Illinois, for which it holds authority from the Illinois Commerce Commission.

Joseph D. Bibb is Director of the Department of Public Safety of the State of Illinois, which department maintains the division known as the State Highway Police, of which defendant William H. Morris is Superintendent. These officials are charged with the duty and responsibility of enforcing the provisions of the Uniform Act Regulating Traffic on Highways, including the section involved in this proceeding.

Notwithstanding our findings of fact and conclusions of law entered concurrently with this opinion, we deem it advisable to elaborate on the factual as well as the legal situation. Navajo Freight Lines, Inc. (hereafter Navajo) is a New Mexico corporation with its principal office at Denver, Colorado. It operates between points in the states of Arizona, California, Colorado, Illinois, Indiana, Iowa, Kansas, Missouri, Nebraska, Nevada, New Mexico, Oklahoma and Texas. It operates approximately 32 million miles per year in interstate commerce, with 7% of its mileage over Illinois highways. Ringsby Truck Lines, Inc. (hereafter Ringsby) is a Nebraska corporation and operates between points in the states of California, Colorado, Illinois, Iowa, Kansas, Missouri, Nebraska, Nevada, Utah and Wyoming. It operates approximately 30 million miles per year in interstate commerce, of which 3% is over Illinois highways. Prucka Transportation, Inc. (hereafter Prucka) is a Nebraska corporation and operates between points in the states of Colorado, Illinois, Indiana, Iowa, Kansas, Missouri,

Nebraska and Wyoming. It operates approximately 5 million miles per year in interstate commerce, of which 5% is over Illinois highways. Denver Chicago Trucking Co., Inc. (hereafter Denver) is a Nebraska corporation operating between points in the states of Arizona, California, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Utah, Washington and Wyoming. It operates approximately 57 million miles per year in interstate commerce, of which approximately 4% is over Illinois highways. Watson Bros. Transportation Co., Inc. (hereafter Watson) is a Nebraska corporation and operates between points in the states of Arizona, California, Colorado, Illinois, Iowa, Kansas, Minnesota, Missouri, Nebraska, New Mexico and Wyoming. It operates approximately 58 million miles per year in interstate commerce, of which 7% is over Illinois highways. Pacific Intermountain Express Co. (hereafter Pacific) is a Nevada corporation and operates between points in California, Colorado, Idaho, Illinois, Indiana, Kansas, Missouri, Montana, Nevada, Oregon, Utah, Washington and Wyoming. It operates approximately 90 million miles per year, of which 3% is over Illinois highways.

Each of the plaintiffs is at present operating its trailers with what is termed the conventional or straight mud or splash guard which is recognized as legal in all the forty-eight states except Illinois. Each of the plaintiffs, in order to operate in Illinois, will be required to equip its trailers with the contour type splash guard required by the Illinois Act, the cost of which is $30 or more per vehicle. Navajo will be required to make such installation on approximately 733 trailers, at a cost of $21,990; Ringsby, on approximately 468 trailers, at a cost of $14,040; Prucka, on approximately 150 trailers, at a cost of $4,500; Denver, on approximately 750 trailers, at a cost of $22,500; Watson, on approximately 1,528 trailers, at a cost of $45,-840; Pacific, on approximately 1,200 trailers, at a cost of $36,000. Moreover, from two to four hours of labor are required to install or remove a contour splash guard. The expense incident to maintenance and replacement is heavy.

The service rendered by plaintiffs requires that they interchange trailers, and for many years this has been the practice. For example, a carrier which serves between Portland, Oregon and Denver, Colorado, will handle and originate a trailer load of perishable commodities destined for Chicago. The original carrier will move the trailer from Portland to Denver and then deliver it, without transferring the load, for movement to destination via any one of the plaintiffs herein. This interchange service constitutes a substantial proportion of the transportation business of each of the plaintiffs, ranging from 30% to 65%. For example, in the year 1956, the revenue derived by Pacific from traffic which moved through its Chicago terminal amounted to approximately $3,-182,000. The revenue derived by Watson for the month of May, 1957, moving through its Chicago terminal, amounted to approximately $1,000,000, of which more than one-third was on traffic moved into the Chicago terminal from points outside of the state of Illinois. It derived revenue in the same month from freight moving through its Peoria, Illinois, terminal of approximately $107,-000, of which about one-third was from freight moving into Peoria from points outside of the state of Illinois. Other plaintiffs received comparable revenue from interchange traffic passing through Illinois.

This interchange of traffic is necessary and essential for the efficient and prompt service which plaintiffs are required to render. More than that, a considerable portion of the service required of plaintiffs could not otherwise be rendered. For instance, plaintiffs render transportation service to the United States Government, including the transportation of explosives which are required to be handled in sealed trailers which cannot be

opened until delivered. This service in the main could not be rendered absent the ability of the originating carrier to interchange with other carriers. Plaintiffs also carry substantial amounts of commodities which because of their nature, such as their size or weight, or because they are perishable, cannot be physically transferred from one trailer to another without damage and delay. Again, proper service can be rendered only because plaintiffs are able to interchange trailers, carrying such shipments, with other carriers which are authorized to complete the journey to the point of the shipment's destination. More than that, many shippers and consignees specify in their bills of lading that the commodity which they ship must remain in the same trailer until it reaches its destination.

This statement, so far, is in the main a brief résumé of the factual allegations of the complaint either admitted or not disputed by defendants. It should also be noted, and this is without dispute, that each of the plaintiffs upon entering Illinois is required not only to equip a trailer owned by it so as to comply with the Illinois Act, but is also required to equip a trailer in use by it but owned by another carrier. This it has no right to do without the specific authority of the other carrier.

We were led to believe at the time of the hearing, and still believe, that all of the states, except Illinois and perhaps Oregon and Idaho, require nothing more than the conventional or straight mud flap, none of which would comply with the Illinois Act. During oral argument the following colloquy took place between Judge Briggle and Mr. Husted, counsel for defendants:

"Judge Briggle: In other words, the Illinois Act is for 48 states, there is no other state that would be acceptable in Illinois?

"Mr. Husted: No.

"Judge Briggle: You say Illinois would be acceptable in those states?

"Mr. Husted: Yes.

"Judge Briggle: But no one of those is acceptable in Illinois, therefore, Illinois' act must be complied with by 48 states?

"Mr. Husted: That is true."

Later, counsel modified his answers by stating that the splash guard provided by Oregon and Idaho would be acceptable in Illinois. In the written brief subsequently filed, counsel brands as untrue "plaintiffs' contention that 'splash guards which are permitted in all other states are illegal in Illinois' and that 'the Attorney General admits this as to 45 states.'" The argument proceeds:

"As above explained, almost all of the states which have anti-splash statutes require a cover or fender and certain ones permit the old style flap as an alternative or stop-gap measure. *The fenders required by these other states are legal in Illinois.* [Italics ours.]"

As we understand this statement, counsel for defendants now claim that splash guards or fenders required by other states would be recognized by Illinois. It is difficult to believe that such a concession was intended. If so, there is no reason for this law suit in which plaintiffs seek to invalidate the Illinois Act which prevents them from entering Illinois equipped with mud flaps in accordance with the laws of the states of their respective domiciles.

It was also conclusively shown that the contour mud flap possesses no advantages over the conventional or straight mud flap previously required in Illinois and presently required in most of the states. Counsel for defendants in oral argument substantially so conceded, as evidenced by the following statement, "There was a wealth of testimony to the effect that in their opinion the old style were better and were preferable and were cheaper and were longer lived, but nobody said that it bore no relation, no reasonable relation to the end sought." In connection with this admission it should be noted that counsel consistently throughout the hearing took the position that

such comparison was irrelevant, objected to the admission of such testimony and for the same reason, we assume, offered no testimony on this point in rebuttal.

The intervenor, Arkansas-Best Freight System, Inc., is an Arkansas corporation and is engaged in the transportation of property by motor vehicle as a common carrier in interstate commerce between points in the states of Arkansas, Kansas, Missouri, Illinois, Louisiana and Texas, pursuant to a certificate of public convenience and necessity. The greater part of its operations over Illinois highways involves the transportation of property moving in interstate commerce.

On December 13, 1957, the Arkansas Public Service Commission entered an order which requires that trailers operating on Arkansas highways be equipped with "a perpendicular, flexible type mud guard hanging at a right angle from the trailer." Since the Illinois Act requires that the splash guard contour the wheel, it is evident that a single splash guard cannot satisfy the requirements of both states. It is, therefore, hardly open to doubt that use by intervenor of a splash guard which meets the requirements of the state of its domicile would be unlawful and not permitted in the state of Illinois. Conversely, a trailer equipped with a mud flap in accordance with the Illinois requirement would not be permitted in the state of Arkansas and its use in that state would be unlawful. In fact, a driver-employe of intervenor engaged in the operation of a trailer upon a public highway in Illinois was, on January 2, 1957, arrested and charged with a violation of the Illinois Act. A hearing on the charge was continued, pending the result of this litigation.

Intervenor's Director of Labor and Safety testified as to the situation resulting from the conflict in the requirements imposed by the two states. In response to the suggestion that a trailer at the state line might be stopped and equipped to comply with the Illinois Act, the witness stated:

"* * * that would entail quite a maintenance program and a terrific additional maintenance cost because we do all our maintenance work, all our major maintenance work at our Little Rock shop, and other points such as St. Louis and Fort Smith are merely emergency service points."

The witness also testified as to the problem presented in complying with the Illinois Act, with trailers received from other carriers in exchange and with trailers loaded with explosives:

"* * * we haul explosives from the Red River Arsenal in Texarkana, and there is one specific carrier I can think of now, Red Ball Motor Freight, who operates primarily in Louisiana and Texas. They also haul a lot of explosives out of there, and when that arsenal calls our Texarkana terminal manager to come out and get 'x' number of loads, they do not take in regard whose trailer it is, but they merely load so many trailers going in our direction, and we go out there and pull those trailers. If they were to load those on a Red Ball trailer, and Red Ball, being a Texas domiciled carrier, we would be all right with his mud flap until we got to the Illinois line. Then we would have to stop there and add the contour mud flap, operate it east of St. Louis, and when it returns to St. Louis, we would have to remove it and the contour mud flap, having to be welded, we would have quite a problem welding them on and several days later going in there and attempting to take them off.

"Further, under the interchange carrier agreement, we would have to contact Red Ball Motor Freight in Dallas, Texas, and receive their authority to add this contour mud flap to their pieces of equipment.

*     *     *     *     *     *

"Q. With a load of explosives, would you be in a position to weld the contour mud flap on the trailer?

"A. Definitely not.

"Q. Why?

"A. Because of the danger of explosion, fire, and things of that nature."

A witness for Watson described the problem presented by an attempt to comply with the Illinois Act, as follows:

"Any time you stop a trailer to do anything to it, it disrupts the service. Motor carriers exist on a fast, efficient transportation service and, if we were required to stop a trailer, assuming we had permission to install the mud flap on a foreign trailer, that is, a connecting line trailer, if we were required to stop that trailer at some state line or some garage to install a contour mud flap, there is bound to be delay which restricts the kind and type of motor carrier service we have been providing for years."

It would unduly prolong this opinion to quote further from the testimony. It is sufficient to state that the testimony of the witnesses just quoted finds abundant corroboration in the record. In fact, the seriousness of the problem to interstate motor carriers is not challenged by defendants. Rather, the state takes the position that it is not concerned with the problem or the difficulty with which such carriers are presented. It is significant that during the hearing, including the argument, no practical or reasonable suggestion was made as to how the Act could be complied with.

Congress has not seen fit to exercise its constitutional power to legislate relative to splash guards on trailers engaged in interstate commerce. The importance of uniformity would seem to suggest the desirability of such legislation. However, in its absence the question arises as to what protection, if any, is afforded by the commerce clause of the Constitution. Defendants do not and could not dispute but that enforcement of the Act would impose some burden upon interstate commerce. Their position, however, is, as we understand, that such burden is immaterial in view of the fact that the Act is non-discriminatory as between intra- and interstate commerce, and further, that the Act is a reasonable exercise by the legislature of its police power, inasmuch as its purpose is to provide for the safety of persons and motor vehicles using the highways. Plaintiffs contend that the burden imposed upon commerce is of such magnitude as to entitle them to protection under the commerce clause, that it is greater than can be justified under the police power and without merit as a safety measure.

We gather from a study of the cases that the conflict in interest between the federal and state governments must be resolved in accordance with the facts of each case. It is our firm conviction, under the proof, that enforcement of the Act would impose not merely some but a tremendous burden upon interstate commerce. Particularly is this so as to commerce between the states of Illinois and Arkansas; in fact, commerce between those two states would be stymied to the extent that its future existence would be imperiled, if not obliterated. More than that, the same insurmountable burden would be imposed upon commerce between Illinois and any other state or states which might see fit to do as Arkansas has done, that is, exclude trailers equipped with the contour splash guard required by the Act. Furthermore, we are convinced that little, if anything, can be claimed for the Act as a safety measure. We have already noted the concession that the weight of the evidence is to the effect that the contour possesses no advantages over the straight or conventional mud flap. While there is some proof of advantages possessed by the contour flap, there is also proof of its disadvantages. In fact, there is rather convincing testimony that use of the contour flap creates hazards previously unknown to those using the highways.

Plaintiffs, in support of the contention that the Act should be held unconstitutional, rely upon Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915, and Morgan v. Commonwealth of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317. Defendants,

in opposition thereto, rely upon South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734, and Maurer v. Hamilton, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969.

In the Southern Pacific case, the Court held unconstitutional the Arizona Train Limit Law which made unlawful operation within the state of a passenger train of more than fourteen cars or a freight train of more than seventy cars. In doing so it reversed the Supreme Court of Arizona which had sustained the Act as a safety measure within the police power of the legislature to enact. It can hardly be doubted but that the reasoning of the Court in Southern Pacific, if applicable, strongly supports plaintiffs' contention in the instant case. Defendants, however, deny its applicability on the ground that the statute there under consideration related to transportation by railroad, while in the instant case it relates to transportation by motor carrier, relying upon the Barnwell and Hamilton cases.

In these cases the Supreme Court sustained the validity of state legislation regulating motor traffic within the state. In Barnwell, the legislation prohibited the use on the state highways of South Carolina of motor trucks whose width exceeded 90″ and whose weight included a load in excess of 2000#. In Hamilton, the Court sustained the validity of a Pennsylvania statute which prohibited the operation on the highways of the state of any vehicle carrying any other vehicle "above the cab of the carrier vehicle or over the head of the operator of such carrier vehicle." [309 U.S. 598, 60 S.Ct. 727.] Undoubtedly, Barnwell and Hamilton stand for the proposition that a state in the exercise of its police power has greater latitude in the regulation of motor vehicles than it does of railroads. This is because the former generally is concerned with matters of local interest while the latter more often is concerned with the national interest.

In Barnwell, the Court stated (303 U.S. at page 185, 58 S.Ct. at page 514):

"* * * it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce but which, because of their local character and their number and diversity, may never be fully dealt with by Congress. Notwithstanding the commerce clause, such regulation in the absence of congressional action has for the most part been left to the states by the decisions of this Court, subject to the other applicable constitutional restraints."

Further, the Court stated (303 U.S. at page 187, 58 S.Ct. at page 515):

"Few subjects of state regulation are so peculiarly of local concern as is the use of state highways. There are few, local regulation of which is so inseparable from a substantial effect on interstate commerce. Unlike the railroads, local highways are built, owned and maintained by the state or its municipal subdivisions. The state has a primary and immediate concern in their safe and economical administration. The present regulations, or any others of like purpose, if they are to accomplish their end, must be applied alike to interstate and intrastate traffic both moving in large volume over the highways. The fact that they affect alike shippers in interstate and intrastate commerce in large numbers within as well as without the state is a safeguard against their abuse."

Thus, the Court treated the weight and width requirements as of local concern even though they affected interstate commerce. It was on this premise that the Court held the Act constitutional and stated that the inquiry under the commerce clause was whether the state legislature in adopting the regulations under attack (303 U.S. at page 190, 58 S.Ct. at page 517) "has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought."

The Hamilton case also treated the statute under attack as relating to a matter of local concern. The Court pointed out (309 U.S. at page 605, 60 S.Ct. at page 730):

"The width, grades, curves, weight-bearing capacity, surfacing and overhead obstructions of the highways differ widely in the forty-eight different states and in different sections of each state. They are like variations with respect to congestion of traffic. State regulation, developed over a period of years, has been directed to the safe and convenient use of the highways and their conservation with reference to varying local needs and conditions."

This appraisement of Barnwell and Hamilton appears to have been recognized by the Supreme Court in the later cases of Southern Pacific Co. and Morgan. For instance, in the Southern Pacific case (325 U.S. at page 767, 65 S.Ct. at page 1519) the Court stated:

"When the regulation of matters of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority." [Citing the Barnwell and Hamilton cases.]

In contrast, the Court on the same page stated:

"But ever since Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23, the states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority."

The Court also stated (325 U.S. at page 781, 65 S.Ct. at page 1526):

"More recently in Kelly v. State of Washington, 302 U.S. 1, 15, 58 S.Ct. 87, 94, 82 L.Ed. 3, we have pointed out that when a state goes beyond safety measures which are permissible because only local in their effect upon interstate commerce, and 'attempts to impose particular standards as to structure, design, equipment, and operation [of vessels plying interstate] which in the judgment of its authorities may be desirable but pass beyond what is plainly essential to safety and seaworthiness, the state will encounter the principle that such requirements, if imposed at all, must be through the action of Congress which can establish a uniform rule. Whether the state in a particular matter goes too far must be left to be determined when the precise question arises.' "

The Court further stated (325 U.S. at page 779, 65 S.Ct. at page 1525):

"The principle that, without controlling Congressional action, a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by 'simply invoking the convenient apologetics of the police power,' Kansas City Southern R. Co. v. Kaw Valley District, 233 U.S. [75], 79, 34 S.Ct. [564], 565, 58 L.Ed. 857 * * *."

This distinction drawn between regulations concerned with local matters and those involving the national interest is emphasized in the Morgan case, wherein the Court held unconstitutional an Act of Virginia which required passenger motor vehicle carriers, both interstate and intrastate, to separate without discrimination the white and colored passengers in their motor buses. First the Court discussed the test to be applied in determining whether a state statute is invalid as imposing an undue burden upon commerce. The Court stated (328 U.S. at page 377, 66 S.Ct. at page 1053):

"The precise degree of a permissible restriction on state power cannot be fixed generally or indeed not

even for one kind of state legislation, such as taxation or health or safety. There is a recognized abstract principle, however, that may be taken as a postulate for testing whether particular state legislation in the absence of action by Congress is beyond state power. This is that the state legislation is invalid if it unduly burdens that commerce in matters where uniformity is necessary —necessary in the constitutional sense of useful in accomplishing a permitted purpose. Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation. Too true it is that the principle lacks in precision. Although the quality of such a principle is abstract, its application to the facts of a situation created by the attempted enforcement of a statute brings about a specific determination as to whether or not the statute in question is a burden on commerce. Within the broad limits of the principle, the cases turn on their own facts."

The Court, commencing on page 378 of 328 U.S. on page 1054 of 66 S.Ct. cites many cases in support of three propositions:

(1) "In the field of transportation, there has been a series of decisions which hold that where Congress has not acted and although the state statute affects interstate commerce, a state may validly enact legislation which has predominantly only a local influence on the course of commerce. [Citing Barnwell and Hamilton.]"

(2) "It is equally well settled that, even where Congress has not acted, state legislation or a final court order is invalid which materially affects interstate commerce. [Citing Southern Pacific.]"

(3) "Because the Constitution puts the ultimate power to regulate commerce in Congress, rather than the states, the degree of state legislation's interference with that commerce may be weighed by federal courts to determine whether the burden makes the statute unconstitutional. [Again citing Southern Pacific.]"

In appraising the effect which the statute had on interstate commerce, the Court stated (328 U.S. at page 381, 66 S.Ct. at page 1056):

"To appraise the weight of the burden of the Virginia statute on interstate commerce, related statutes of other states are important to show whether there are cumulative effects which may make local regulation impracticable."

In holding the Act unconstitutional, the Court further stated (328 U.S. at page 386, 66 S.Ct. at page 1058):

"As there is no federal act dealing with the separation of races in interstate transportation, we must decide the validity of this Virginia statute on the challenge that it interferes with commerce, as a matter of balance between the exercise of the local police power and the need for national uniformity in the regulations for interstate travel."

Thus, the distinction between the two lines of cases does not arise, as defendants contend, from the fact that the Court, in Barnwell and Hamilton, was concerned with transportation by motor vehicle and in Southern Pacific with transportation by railroad. The distinction lies in the fact that in the two former cases the provisions under consideration related to matters of local concern while in the latter case the provision related to a matter of national concern. Defendants apparently recognize this distinction by arguing that the Act under attack is of local concern, on the basis that Illinois is a "wet-weather" state, having a large amount of wet, rainy and snowy weather, causing its roads to be wet and dirty for a substantial portion of each year. Defendants offered in evidence a report of the United States Weather Bureau showing the average annual precipitation at different points in the state. No similar proof, or proof of

any kind, was offered as to the weather and highway conditions in other states. The mere fact that large amounts of rain and snow fall upon the highways of Illinois furnishes no support to the argument that the requirement as to splash guards is a matter of local concern in the absence of a showing that weather conditions affecting highways is different in other states, particularly those surrounding Illinois. We know, however, from experience common to all who travel the highways of this country that the situation under discussion is the same or similar in many states, and perhaps all. Particularly is that true in states surrounding Illinois and others of the midwest.

■ Defendants take no note of the burden which the Act places upon commerce, which perhaps is consistent with the theory that it relates to a matter of local concern and the burden, therefore, is immaterial. We reject the premise upon which this theory is predicated. The burden is material because enforcement directly relates to the national interest. That burden, in our judgment, will be tremendous. In fact, enforcement is likely to produce a demoralizing effect upon the operations conducted by plaintiffs, the intervenor and others similarly engaged. The certificate of public convenience and necessity issued to plaintiffs and other motor carriers by the Interstate Commerce Commission requires that they "shall render reasonably continuous and adequate service to the public in pursuance of the authority herein granted, and that failure to do so shall constitute sufficient grounds for suspension, change or revocation of this certificate." It is not discernible to us how plaintiffs can discharge their responsibilities under this certificate and at the same time comply with the requirements of the Illinois Act. It is

hardly open to question but that compliance will result in intolerable delay in transportation and the expenditure of large sums of money for equipment and maintenance.

■ We are not impressed with defendants' argument that the Act should be sustained on the basis that the legislature acted within its police power and that the means of regulation chosen by it are reasonably adapted to the end sought. We assume that the contour splash guard will serve some beneficial purpose in eliminating splash. The same could be said for a piece of cardboard or other object hung behind the rear wheels of a trailer. As already shown, the conventional or straight mud flap previously recognized in Illinois and presently recognized by most and perhaps all of the other states served the purpose of preventing splash as well as does the contour guard. The result of the requirements of the Act is to place a great burden upon commerce, without any compensating benefit to the state. Under the circumstances, it cannot be held that the requirements of the Act are reasonably adapted to the end sought. In any event, a challenge that the Act interferes with commerce requires this Court to decide its validity "as a matter of balance between the exercise of the local police power and the need for national uniformity in the regulations for interstate travel." Morgan v. Commonwealth of Virginia, 328 U.S. 373, 386, 66 S.Ct. 1050, 1058, 90 L.Ed. 1317. In our judgment, the burden which the Act casts upon commerce far outweighs any benefit derived by the state.

It is, therefore, our view and we so hold that the Act is unconstitutional and void, as violative of Article I, Section 8, of the Constitution of the United States, and that plaintiffs are entitled to a decree permanently enjoining its enforcement.