**In re KEINATH BROTHERS DAIRY FARM, a Michigan co-partnership, Debtor.**

**Bankruptcy No. 86–09726.**

United States Bankruptcy Court, E.D. Michigan, N.D.

April 9, 1987.

Jay S. Kalish, Southfield, Mich., for debtor.

John J. McQuillan, Bay City, Mich., for Federal Land Bank.

## MEMORANDUM OPINION ON DEBTOR'S MOTION TO CONVERT FROM CHAPTER 11 TO CHAPTER 12

ARTHUR J. SPECTOR, Bankruptcy Judge.

On November 24, 1986, the debtor, Keinath Brothers Dairy Farm, a Michigan co-partnership, comprised of Ronald N. Keinath, John J. Keinath and Larry L. Keinath, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Twenty-two days thereafter, on December 16, 1986, the debtor moved to convert this case to Chapter 12. The motion was contested by Federal Land Bank of St. Paul, which argued that § 302(c)(1) of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. 99–554 restricted the availability of the option to convert a Chapter 11 case to Chapter 12 to debtors in cases which were filed on or subsequent to November 26, 1986, and that since this case was filed prior thereto, the debtor lacked the ability to convert it to Chapter 12.

The Code section dealing with converting a Chapter 11 case to a case of a different chapter, § 1112(d), was amended as part of the foregoing Act. It now reads:

The court may convert a case under this chapter to a case under chapter [12 or] 13 of this title only if—

(1) the debtor requests such conversion;

(2) the debtor has not been discharged under § 1141(d) of this title[; and (3) if the debtor requests conversion to chapter 12 of this title, such conversion is equitable.]

(The [ ] denotes additions made pursuant to § 256 of the Act.) Section 302(c) of the Act, however, states that

(1) the amendments made by subtitle B of title II [which enacted the Family Farm Amendments] shall not apply with respect to cases commenced under title 11 of the United States Code before the effective date of this Act.

The effective date of the Act was November 26, 1986. As subtitle B of title II includes, among other things, § 256, the section which amended Code § 1112 to permit conversions from Chapter 11 to Chapter 12, the statutory framework clearly envisions no conversions of Chapter 11 (or other chapter) cases which were filed before November 26, 1986.

The Federal Land Bank of St. Paul makes this argument. It says that § 302(c)(1) is unambiguous and clearly limits the availability of conversion from Chapter 11 to Chapter 12 to debtors in cases filed on or subsequent to the effective date of the statute, November 26, 1986. The debtor argues that § 302(c)(1) of the Act is ambiguous, and ought therefore to be construed by reference to legislative history, which clearly supports the view that conversion under these circumstances is appropriate. The legislative history comes in the form of a conference committee report. Comments in a conference committee report are the best indication of congressional intent. *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472, 478 (1984); *Railroad Commission v. Chicago, B. & Q. Ry.*, 257 U.S. 563, 588–589, 42 S.Ct. 232, 237, 66 L.Ed. 371, 383 (1922). Here, the Committee of Conference said:

It is not intended that there be routine conversion of Chapter 11 and 13 cases, pending at the time of the enactment, to Chapter 12. Instead, it is expected that courts will exercise their sound discretion in each case, in allowing conversions only where it is equitable to do so.

Chief among the factors the court should consider is whether there is a substantial likelihood of successful reorganization under Chapter 12.

Courts should also carefully scrutinize the actions already taken in pending cases in deciding whether, in their equitable discretion, to allow conversion. For example, the court may consider whether the petition was recently filed in another chapter with no further action taken. Such a case may warrant conver-

sion to the new chapter. On the other hand, there may be cases where a reorganization plan has already been filed or confirmed. In cases where the parties have substantially relied on current law, availability to convert to the new chapter should be limited.

Joint Explanatory Statement of the Committee of Conference, H.R. Conf.Rep. No. 958, 99th Cong., 2d Sess., 1986, U.S.Code Cong. & Admin.News 1986, pp. 5227, 5249.

In the alternative, the debtor argues that even if § 302(c)(1) is held to be unambiguous, to rule that debtors lack the ability to convert Chapter 11 cases pending on the effective date of the act to Chapter 12 would fly in the face of congressional intent as so clearly expressed in the conference committee report. It therefore says that the statute ought to be construed, notwithstanding its clarity to the contrary, in conformance with the express legislative intentions.

In an attempt to establish an ambiguity, the debtor presented the testimony of Morris Garfinkel, Chairman of the English Department of the Oak Park, Michigan School System. He diagrammed the sentence contained in § 302(c)(1), but, in our mind, failed to set forth a reading contrary to the plain reading urged on us by the Federal Land Bank.

Therefore, the legal issue is whether the legislative history which distinctly expresses an intention that debtors in Chapter 11 and Chapter 13 cases pending on November 26, 1986, may convert their cases to Chapter 12 controls over the plain contrary language of the statute. This issue is one which, after centuries of court interpretations of statutes, ought to have been finally decided by now. Yet the more ink that has been spilled on this issue over the past half century, the more muddled the answer has become.

The many cases deciding this Chapter 12 conversion issue can be fairly divided into three distinct camps. One camp rigidly adheres to the literalist approach and disregards legislative history. *See In re Albertson,* 68 B.R. 1017, 15 B.C.D. 577 (Bankr.W.D.Mo.1987); *In re Barclay,* 69

B.R. 552 (Bankr.C.D.Ill.1987); *In re Council,* 70 B.R. 20 (Bankr.W.D.Tenn.1987); *In re Glazier,* 69 B.R. 666, 15 B.C.D. 575 (Bankr.W.D.Okla.1987); *In re Groth,* 69 B.R. 90, 15 B.C.D. 565 (Bankr.D.Minn. 1987); *In re Hughes,* 70 B.R. 66 (Bankr.W. D.Va.1987); *In re Lindsey,* 69 B.R. 632 (Bankr.C.D.Ill.1987); *In re Petty,* 69 B.R. 412 (Bankr.N.D.Ala.1987); *In re Rossman,* 70 B.R. 985 (Bankr.W.D.Mich.1987); *In re B.A.V., Inc.,* 68 B.R. 411, 15 B.C.D. 550 (Bankr.D.Colo.1986); *In re Tomlin Farms, Inc.,* 68 B.R. 41, 15 B.C.D. 296 (Bankr.D.N. D.1986). The other pole applies what it believes is a contrary principle, that is, that the clearly expressed legislative intention to allow pre-November 26, 1986 Chapter 11 cases to be converted to Chapter 12 overrides the plain language of § 302(c)(1) forbidding it. *See In re Big Dry Angus Ranch, Inc.,* 69 B.R. 695 (Bankr.D.Mont. 1987); *In re Erickson Partnership,* 68 B.R. 819, 15 B.C.D. 614 (Bankr.D.S.D.1987); *In re Fischer,* 72 B.R. 634 (Bankr.D.Kan., 1987); *In re Henderson,* 69 B.R. 982 (Bankr.N.D.Ala.1987); *In re Mason,* 70 B.R. 753, 15 B.C.D. 534 (Bankr.W.D. N.Y.1987). The third camp holds against conversion of existing cases but either examines legislative history and finds its direction to be unclear, *In re Spears,* 69 B.R. 511, 15 B.C.D. 551 (Bankr.S.D. Iowa 1987), or finds some other reason to deny the motion, *In re Ray,* 70 B.R. 431 (Bankr. E.D.Mo.1987).

We find all three approaches less than satisfactory. The first camp pays no attention whatsoever to the impressive number of U.S. Supreme Court cases which seem to direct that courts not adhere to the literal words of a statute when to do so would subvert congressional intent clearly expressed in conference committee reports or other legislative history. We cannot disregard the existence of these cases or their apparent instruction. The second camp too readily disregards the well-established principle that clear statutes need no construction in order to reach a result that many feel is probably the "right" one. The in-between camp takes no stand on the question of how to properly approach interpretation

of a statute whose words seem to need no interpretation, merely application. We believe that to decide the question in this case we must first decide which of the two theories of statutory interpretation is an appropriate tool for such a task.

For many years the principle was firmly established that one looked to legislative history only if the meaning of the statute in question was unclear. If the statute was clear and unambiguous, and if it did not cause an absurd or futile or ineffective result when literally applied, the statute required no "construction"; therefore, resort to history to divine its meaning was unnecessary and improper. *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940); *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333, 59 S.Ct. 191, 200, 83 L.Ed. 195, 205–206 (1938); *Sorrells v. United States*, 287 U.S. 435, 446, 53 S.Ct. 210, 214, 77 L.Ed. 413, 419 (1932); *United States v. Katz*, 271 U.S. 354, 357, 46 S.Ct. 513, 514, 70 L.Ed. 986, 988 (1925); 73 Am. Jur.2d *Statutes*, § 195 (1974); Sutherland, *Stat. Const.* § 46.01 (4th ed. 1984).

Among the strongest statements of the literalist maxim are those found in *Railroad Commission v. Chicago, B. & Q. Ry.*, 257 U.S. at 588–589, 42 S.Ct. at 237, 66 L.Ed. at 383, where the Court said:

> Great stress is put on the legislative history of the Transportation Act to show that the bill was not intended to confer on the Commission power to remove any discrimination against interstate commerce involved in a general disparity between interstate and intrastate rates. Committee reports and explanatory statements of members in charge, made in presenting a bill for passage, have been held to be a legitimate aid to the interpretation of a statute where its language is doubtful or obscure. But when taking the act as a whole, the effect of the language used is clear to the court, extraneous aid like this cannot control

the interpretation. Such aids are only admissible to solve doubt, and not to create it.

(citations omitted). Another strong statement is found in *Ex Parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207, 1211 (1949):

> Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of § 1404(a), but from its legislative history. The short answer is that there is no need to refer to the legislative history where the statutory language is clear. "The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260, 89 L.Ed. 921, 933, 65 S.Ct. 605, [614] (1945). This canon of construction has received consistent adherence in our decisions.[1]

Finally, in *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 449–450, 57 S.Ct. 298, 300, 81 L.Ed. 340, 344 (1937), the Court said:

> The legislative history of this provision, and the successive alterations of its wording in both houses of Congress and in conference, to which we are referred, cannot affect its interpretation, since the language of the act as adopted is clear. The only phrase to which petitioners point in support of their contention that the claim is to be divided into two parts, one for an amount not exceeding three years' rent, to stand on a parity with other provable claims, and the other, representing the balance, to be subordinated to creditors' claims, but preferred to the interest of stockholders, is: "shall be treated as a claim ranking on a parity with debts which would be provable under § 63(a), 11 U.S.C.A. § 103." We need not consider the suggestion that the words "on a parity" were left in the clause *per incuriam* when formulation

---

1. Amazingly, the Court claimed that *United States v. American Trucking Ass'n*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1351 (1940) supported this proposition. As discussed *infra, American Trucking* is frequently cited for the opposite proposition. Moreover, despite the absolutist sound of the quoted language, the Court nonetheless felt compelled to examine legislative history. This is not uncommon. *See* n. 2.

of an earlier draft was altered, since, in our opinion, their presence, however they came to be inserted, cannot overcome the direct mandate that "the claim ... shall be limited."

In that case, a bankruptcy case, the stockholders' committee, relying upon § 77(b) of the (now repealed) Bankruptcy Act, which stated:

> The claim of a landlord ... for ... indemnity under a covenant contained in such lease shall be treated as a claim ranking on a parity with debts which would be provable under § 63(a) of this Act, but shall be limited to an amount not to exceed the rent, without acceleration, reserved by said lease for the three years next succeeding ... the date of reentry of the landlord,....

objected to the claim of a landlord. The landlord argued that the statute limited its unsecured claim only insofar as it was on a parity with other unsecured creditors but that it continued to have a claim for the remainder of the rental which was subordinate to unsecured creditors but prior to stockholders. The Supreme Court applied the plain words of the statute and disregarded the landlord's request to examine legislative history which it claimed supported its view. Were we to utilize the same process, we would merely read § 302(c)(1), determine that the statute is clear and disregard the conference committee report.

However, with the advent of *United States v. American Trucking Ass'n*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345, 1350–1351 (1940), this black letter rule of law was apparently altered. In that case the Supreme Court opined:

> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.

> Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination". The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion. (Footnotes omitted).

Suddenly a new exception to the rule of no resort to history when a statute is plain was created. Now, it seemed, history may be considered an appropriate resource for finding the meaning of an otherwise clear and unambiguous statute if: (1) its literal application would yield an absurd result; (2) its literal application would yield an ineffective or futile result; or (3) the clear intent of the Congress was to do something other than what it said in the statute. Of course, in order to determine whether Congress intended something different from what it plainly said the court must examine legislative history. The tautology is complete, as one can never know whether to examine legislative history without first examining legislative history.

A number of recent Supreme Court cases have cited this remarkable language approvingly. *E.g. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973, 983 (1982);

*American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Consumer Products Safety Comm. v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Perry v. Commerce Loan Co.,* 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966). Not surprisingly, the debtor has done so too. If the law is as stated in *American Trucking,* then we should follow *In re Erickson Partnership,* and see if Congress *intended* to allow conversions of cases existing on November 26, 1986 to Chapter 12 even though it quite clearly said the opposite. If we find that it did intend a different result, then, according to the statement in *American Trucking,* we should rule that Congress' intentions supersede its express direction to the contrary. The logic of *American Trucking* compelled the result in *Erickson Partnership,* if one believes that the language quoted in that case is indeed the law.

However, although the door to legislative history is usually left somewhat ajar, the Supreme Court has not abandoned the plain meaning rule. In *Central Trust Co. v. Creditors' Committee (In re Geiger Enter., Inc.),* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982), the Supreme Court, once again in a bankruptcy case, somewhat similar in context to the one at bench, strongly re-affirmed the doctrine of literalism. The question there was whether a debtor in Chapter XI of the Bankruptcy Act of 1898 could dismiss that petition and immediately refile a petition for relief under Chapter 11 of the new Bankruptcy Code of 1978. The Court said:

> The language of § 403(a) is unequivocal. It provides that cases filed under the Bankruptcy Act *"shall* be conducted and determined under such Act as if [the New Code] had not been enacted." It makes *no* exception for petitions to be refiled under the New Code; indeed, it expressly provides that petitions such as Geiger's *"shall* continue to be governed" by the Bankruptcy Act. Any exception to this mandate recognized by the Court of Appeals is of wholly judicial creation, supported by neither the language of the New Code nor its legislative history.[2]
>
> ....
>
> "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 61 L.Ed. 442, 37 S.Ct. 192 [194] (1917). While the Court of Appeals may have reached a practical result, it was a result inconsistent with the unambiguous language used by Congress. Accordingly, the petition for a writ of certiorari is granted, and the judgment is reversed.

Without discussing the *American Trucking* exception, the Court in these cases re-stated the general proposition that the starting point for statutory interpretation is the language of the statute itself and if the language is unambiguous, judicial inquiry is complete.

These various pronouncements appear irreconcilable; only one can be correct at a time. However, it is the task of an inferior court to try to harmonize conflicting statements of a superior tribunal if it can do so

---

**2.** Despite its recent pronouncements indicating a return to the doctrine of literalism, the Supreme Court frequently has wound up examining legislative history. *See e.g., James v. United States,* 478 U.S. ——, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986); *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985); *Garcia v. United States,* 469 U.S. 70, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984); *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980); *Helvering v. Hammel,* 311 U.S. 504, 510–511, 61 S.Ct. 368, 371, 85 L.Ed. 303, 307 (1940). Even in *Central Trust Co. v. Creditors' Committee, (In re Geiger Enter., Inc.),* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982), with its ringing endorsement of the doctrine, the Court still, in footnote 1, apparently felt compelled to examine legislative history. The mere fact that such history supported the plain meaning of the statute does nothing to dispel our unease. What if the legislative history supported the debtor's view? Would the Court have ignored the plain meaning of the statute? If not, then why even look at the history? The Supreme Court's ambivalence as to the standard for courts to utilize when confronting these questions is most unhelpful.

with intellectual honesty. *See United States Freight Co. v. United States*, 422 F.2d 887, 897, 190 Ct.Cl. 725 (1970); *Melcher v. Federal Open Market Committee*, 644 F.Supp. 510, 516 (D.D.C.1986); *Cooper v. Califano*, 81 F.R.D. 57, 70 (E.D.Pa.1978).

Statutory interpretation is an extremely important field of jurisprudence. It is a large part of the law of judging. Its impact cuts across all of the substantive bodies of law. For example, the cases cited merely in this opinion include statutes in the following fields: railroad regulation (*Johnson v. Southern Pacific Co.*, 196 U.S. 1, 25 S.Ct. 158, 49 L.Ed. 363 (1904)); federal jurisdiction (*Ohio ex rel Popovici v. Agler*, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930)); trucking regulation (*Maurer v. Hamilton*, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1939) and *United States v. American Trucking Ass'n, supra*), tax law (*Helvering v. Morgan's Inc.*, 293 U.S. 121, 55 S.Ct. 60, 79 L.Ed. 232 (1934)), consumer law (*Consumer Products Safety Comm. v. GTE Sylvania, Inc., supra*), civil rights (*American Tobacco Co. v. Patterson, supra*), and even bankruptcy law (*Kuehner v. Irving Trust Co., supra; Perry v. Commerce Loan Co., supra*). Therefore, if the Supreme Court were to overrule a maxim of long standing in this field, one would expect greater fanfare. Instead, the *American Trucking* tautology, which when applied literally,[3] obliterates the old plain meaning doctrine, is itself *obiter dictum* and relies entirely on dicta in previous cases. The object in the *American Trucking* case was to decide the case at bench. In the pursuit of that goal, it may be argued, the unfortunate language crept in.

In the first year of law school we learned how to abstract from the mass of words in a case the one thought upon which the ultimate decision rests: the holding of the case. To assist us in the search for that holy grail, we were taught to seek and find what the court actually *did*, as opposed to what it merely said. *See* 1B *Moore's Federal Practice*, ¶ 0.402[2] (1984). Using that hoary method, we find that in every case where the Supreme Court directed itself to legislative history to discern the meaning of a clear and unambiguous statute, it decided the case in a manner consistent with the plain words of the statute or found legislative history itself to be ambiguous. Said in another way, we could find no case where the Supreme Court interpreted a statute to mean what the legislative history alone indicated as opposed to what the clear, unambiguous words of the statute dictated when a literal reading of the statute would not have created an absurd or futile result. Thus, the Supreme Court's statement in *American Trucking* that "even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole *this Court has followed that purpose, rather than the literal words*" is not accurate. (Emphasis added). The cases cited in support of that statement simply do not support it. Footnote 21 in *American Trucking* lists as the authority for the statement *Helvering v. Morgan's, Inc., supra; Johnson v. Southern Pacific Co., supra; Ohio ex rel Popovici v. Agler, supra; Smiley v. Holm*, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1931); *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933) and *Maurer v. Hamilton, supra*.

In *Maurer v. Hamilton*, the question was whether the phrase "safety of operation and equipment" with respect to Interstate Commerce Commission regulation of trucking was broad enough to include the load carried by the trucks. The intent of the legislation is not self-evident from the mere words of that statute, so determining the question required far more than merely reading the statute. Obviously construction was necessary, and therefore the fact that it was resorted to in that case does not support the proposition in the text.

In *Williams v. United States*, the question was whether judges of the Court of Claims enjoyed Article III status. It cannot fairly be said that that case is on point in any material way with the question at

---

**3.** Used in this context, the term "literal" is ironic.

hand. Likewise, *Smiley v. Holm* is also not on point.

*Helvering v. Morgan's, Inc.*, although on point, does not support the statement in the text that the Court had actually followed legislative history when that history ran contrary to the express words of the statute. In that case, the Court was construing "taxable year", an ambiguous term which could be logically read to mean a full 365 day period or the number of days in the taxpayer's fiscal year if other than on a calendar year basis. Because the Supreme Court found that two interpretations of the term "taxable year" were reasonable, it was appropriate for it to resort to construction, including an examination of legislative history.

*Johnson v. Southern Pacific Co.*, was a case which decided whether the word "car" in a section of a federal act regulating railroads included a locomotive. The Supreme Court held that it did. It is quite clear that two different reasonable interpretations of the word "car" were appropriate and the Court had to choose which of the two more closely abided by the legislative intent. Obviously, therefore, resort to legislative history was not only appropriate but necessary. Moreover, in that case, the Court looked not so much to legislative history but at the other sections of the act in question to discern the legislative intent. This has always been an appropriate method of interpreting statutes and may even be utilized when the meaning of the words in a particular section of the statute appear to be clear and unambiguous.

*Ohio ex rel Popovici v. Agler* involved a question of federal jurisdiction. In that case, Mrs. Popovici sued Mr. Popovici, a vice-consul of the nation of Romania for a divorce in the Ohio courts. Mr. Popovici demurred on the basis that both the U.S. Constitution and the Judicial Code of 1911 vested original and exclusive jurisdiction of suits against ambassadors, consuls and vice-consuls of foreign nations in the federal judicial system. The Court held that the Constitution did not preclude the states from exercising jurisdiction in such matters. It also held that the "pretty sweeping" language in the Judiciary Act of 1911 was "to be interpreted in the light of the tacit assumptions upon which ... the language was used". *Id.*, 280 U.S. at 383, 50 S.Ct. at 155, 74 L.Ed. at 497. Because there was a century of unbroken precedent establishing the principle that domestic relations were no business of the federal judiciary, the Supreme Court interpreted the broad grant of jurisdiction contained in the Judiciary Act of 1911 over lawsuits involving vice-consuls as having an implicit exception for purposes of domestic relations matters. Although it may be argued that this case does in some sense support the assertion in the text of the *American Trucking* case that the Court has followed the intention of the legislature even when the plain words of the statute point in a different direction, such a reading is overly broad.

It is one thing for a court to fashion exceptions to a statute of general application. "It is undoubtedly the duty of the court to ascertain the meaning of the Legislature, from the words used in the statute, and the subject matter to which it relates; and to restrain its operation within narrower limits than its words import, if the court is satisfied that the literal meaning of its language would extend to cases which the Legislature never designed to embrace in it." *Lessee of Brewer v. Blougher*, 39 U.S. (14 Pet.) 178, 198, 10 L.Ed. 408, 418 (1840). Since all statutory interpretation cases are seeking to find a way to interpret a statute sensibly, and all laws should receive a sensible construction, general terms should be limited in their application so as not to lead to injustice, oppression or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. *Hawaii v. Mankichi*, 190 U.S. 197, 213, 23 S.Ct. 787, 789, 47 L.Ed. 1016, 1021 (1903); *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 19 L.Ed. 278 (1869). For example, although his action may have violated a criminal trespass statute, it is a good defense in law for the defendant to show that he would have frozen to death had he not broken into the unoccupied cab-

in of another. One does not fault the trial judge for instructing the jury that under such circumstances self-preservation is an exception to the general criminal statute forbidding trespass. We believe that the holding in *Ohio ex rel Popovici v. Agler*, fits better into this niche than the one designed for it in *American Trucking*.[4]

*American Trucking*, itself, did not hold in conformity with its own tautological exception. In that case, the question was whether the term "employees" in section 204(a) of the Motor Carrier Act included employees other than those strictly concerned with the safety of operations. The Fair Labor Standards Act limited the work week of all employees. The Association of Truckers preferred that the Motor Carrier Act, which gave the Interstate Commerce Commission authority to "establish reasonable requirements with respect to ... qualifications and maximum hours of service of employees and safety of operations and equipment" be read to give the ICC authority to set the hours of all employees involved in trucking. The question then was whether that language in the Motor Carrier Act should be restricted to trucking industry employees involved in safety of operations only or be read broadly to give all employees in the trucking industry an exemption from the Fair Labor Standards Act. The Supreme Court held that the term "employees" for purposes of the Motor Carrier Act was limited to employees involved directly with the safety of operations and so the Fair Labor Standards Act governed all other employees. Notwithstanding the ringing oratory quoted earlier, the Supreme Court did not follow legislative history contrary to the words of the statute since it found an "*absence* in the legislative history of the Act of any discussion of the desirability of giving the commission [ICC] broad and unusual powers over all employees". *Id.*, 310 U.S. at 547, 60 S.Ct. at 1066, 84 L.Ed. at 1353 (emphasis

added). Moreover, the statute construed was never described by the Supreme Court as being plain and unambiguous. Instead, the Court basically conceded that there were two fair constructions to the statute. The famous quote, therefore, is *obiter dictum*, and the *American Trucking* case itself does not stand for the proposition for which it is so frequently cited.[5]

*Obiter dicta* "may be respected but ought not to control the judgment in a subsequent suit when the very point is presented for a decision." *William v. United States*, 289 U.S. at 568, 53 S.Ct. at 756, 77 L.Ed. at 1378, *quoting Cohen v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257, 290 (1821). For purposes of the case before us, the issue is one of the proper rule of law in statutory interpretation: Does a court look to legislative history when the statute is clear and unambiguous, when applying the statute literally would not lead to a futile or absurd result? Although it *says* that we may, *American Trucking* does not *hold* that we may.

Other cases have cited the quoted language from *American Trucking* approvingly. Unfortunately for the debtor, those cases likewise do not support the use of legislative history's instruction in derogation of the plain meaning of the statute. *Perry v. Commerce Loan Co.*, required the Supreme Court to determine whether confirmation of a Chapter XIII extension plan was barred by the discharge in bankruptcy obtained by the bankrupt within the previous six years. A person filing a Chapter XIII was entitled to confirmation of a wage earner extension plan if he was not "guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of the bankrupt". § 656(a)(3) of the Bankruptcy Act of 1898 (repealed). One of those acts which would bar a discharge under straight bankruptcy was having received a discharge within the previ-

---

4. In this category of cases also fit *Kelly v. Robinson*, 479 U.S. ——, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) and *Midlantic National Bank v. New Jersey*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

5. What is left then is conflicting pronouncements by the Supreme Court. The excruciating irony of having to decide, in the context of this case, whether to follow what the Supreme Court plainly *said* in *American Trucking* or what it *intended to do* in that case, is unavoidable.

ous six years. The Court quoted the *American Trucking* case extensively and then, when giving its holding, ignored it. In essence, the Supreme Court held that a literal reading of the section in question did not compel a result different from the legislative intent. It *held* that a debtor is not "guilty" of any acts or unfulfilled duties when he proposes an extension plan within six years of his receipt of a bankruptcy discharge. *Id.*, 383 U.S. at 400, 86 S.Ct. at 857, 15 L.Ed.2d at 854.[6]

*American Tobacco Co. v. Patterson*, involved a determination of whether § 703(h) of the Civil Rights Act, which upheld employment seniority systems which had an unintended effect of discriminating on account of race, color, religion, sex or national origin, applied to seniority systems adopted after the effective date of the Civil Rights Act. Nothing in the statute itself spoke to the question. The employer argued that the plain language of § 703(h) applied to post-Act as well as pre-Act seniority systems. The employees argued that legislative history evinced a clear intention by the Congress to limit that section to seniority systems in effect at the time of the enactment of the Civil Rights Act. First the Court looked at other sections of the entire Civil Rights Act. It noted that other parts of the Act contained express grandfather clauses. It was therefore reluctant to read into § 703(h) a grandfathering limitation. The Court criticized the lower court for finding support for a pre-Act and post-Act distinction in the legislative history. Only in the process of doing so did it even examine legislative history. It then, purely as dictum, determined that legislative history did not support the lower court's or the employees' construction. In short, what the Supreme Court did was apply the plain words of the statute, and criticize the lower court for straying from them.

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*, presented the question of whether § 6(b)(1) of the Consumer Product Safety Act, which required the Consumer Product Safety Commission to provide to the manufacturer a notification of its intention to publicly disclose information and a summary of the information to be disclosed at least 30 days before the public disclosure is made, applied when the commission was served with a Freedom of Information Act request. The Supreme Court began "with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.*, 447 U.S. at 108, 100 S.Ct. at 2056, 64 L.Ed.2d at 772. It noted that the section in question applied to the "public disclosure of any information" which the commission obtained and which was to be disclosed to the public. It interpreted the word "any" within that statute in its ordinary sense, and held that the plain meaning of the statute allowed for no contrary construction. It gathered further support for this proposition by examining other provisions within the Consumer Product Safety Act itself. The commission then argued that the legislative history of the CPSA showed that Congress intended a different result. However, any discussion of legislative history (which the Court found to be supportive of its original interpretation), at that point, was again mere dictum.

A case cited by the debtor and by several of the bankruptcy court opinions is *Griffin v. Oceanic Contractors, Inc., supra.* In that case, too, there appears language which seems to strongly support the argument that a court may examine legislative history and follow it even in the face of

---

6. As Justice Harlan said in dissent:
    The process by which the Court has undertaken to release the debtor from the impact of these straightforward statutory provisions seems to me wholly unavailing. The Court's major argument is built upon its reading of the word "guilty" in § 656(a)(3).... The argument is that since receiving a prior discharge is neither unlawful nor morally reprehensible, one cannot be "guilty" of it, and hence that the six-year "discharge" provision cannot be a bar to a Chapter XIII extension plan.
    383 U.S. at 405, 86 S.Ct. at 860, 15 L.Ed.2d at 837.

contrary statutory language which is clear and unambiguous. It stated: "In rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling." *Id.,* 458 U.S. at 571, 102 S.Ct. at 2350, 73 L.Ed.2d at 981. However, it is more important to see what the Court did in that case. There, a seaman sought penalty wages under 46 U.S.C. § 596, which requires the payment of double wages to seamen for each day that payment of their wages is delayed without sufficient cause. The two lower courts held that the trial court had discretion to limit the appropriate period for imposition of the penalty. The Supreme Court reversed. It applied the plain language of the statute in spite of the respondent's argument that "the legislative purpose of the statute is best served by construing it to permit some choice in determining the length of the penalty period." *Id.,* 458 U.S. at 571, 102 S.Ct. at 3250, 73 L.Ed.2d at 980. The Court reviewed the legislative history and found that the respondent's argument as to Congress' intentions was not borne out by that legislative history. Therefore, once again the plain language of the statute prevailed.

In *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575, 579 (1961), the Supreme Court said:

> Having concluded that the provisions of § 1 are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act. Since the State has placed such heavy reliance upon that history, however, we do deem it appropriate to point out that this history is at best inconclusive.

We feel that in most of the cases cited herein, the Supreme Court did the same thing. The Court determined that a clear and unequivocal statute should be applied according to its terms and then looked at legislative history to either bolster its initial determination or decide that such history is not clearly at odds with the plain words of the statute anyway. *See In re Albertson,* 68 B.R. at 1020. It is true that "even dictum is entitled to serious consideration by the lower federal courts when it

appears in an opinion by the Supreme Court," *In re Comac Co.,* 402 F.Supp. 43 (E.D.Mich.1975), and this is probably especially so where the dictum is repeated in case after case. However, when the dictum conflicts with the *holdings* of other cases, lower courts must follow the holdings and disregard the dictum.

All of the cases discussed so far have been U.S. Supreme Court cases. A recent opinion of the Sixth Circuit Court of Appeals citing and applying the mischievous quotation in *American Trucking* causes us to hesitate once again before applying the plain meaning doctrine in this case. In *United States v. Underhill,* 813 F.2d 105 (6th Cir.1987), the defendant argued that 18 U.S.C. § 2515 prohibited the government from introducing at his trial for violation of the federal anti-gambling statutes audio cassette tapes seized from his apartment. The recorded conversations involved the exchange of gambling information and the placing of bets on sporting events. The statute stated:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing or other proceeding in or before any court ... if the disclosure of that information would be in violation of this chapter.

The district court suppressed the evidence, albeit reluctantly. After citing *American Trucking* approvingly, the Court of Appeals stated: "If the language of §§ 2511(2)(d) and 2515 were applied literally ... it would produce an absurd result that we are confident Congress did not intend." *Id.* at 112. It appears, therefore, that this case falls within one of the recognized exceptions to the plain meaning doctrine, that is, when the literal application of a statute creates an absurd result you do not apply the statute literally. This case can also be distinguished by noting that what the Sixth Circuit did was to merely create a judicial exception to the broad reach of the general statute. As noted earlier, a judicial exception to apparently overbroad statutory language is not of the

same type as a construction which would alter the meaning of the word "white" in a statute to say "black" merely because Congress intended to say "black" when it actually said "white". To accept the debtor's argument, we would indeed have to rule that when Congress *said* that pending cases *MAY NOT* be converted to Chapter 12, it *meant to say* that pending cases *MAY* be converted to Chapter 12. This would not involve the creation of an exception. It would be turning the English language upon its head. *See In re Delbridge,* 61 B.R. 484, 489 (Bankr.E.D.Mich.1986). No case has been found in which a court made so radical a change in the meaning of a statute.

Finally, despite the Supreme Court's frequently stated dicta that it will not allow a literal reading of a statute to produce a result demonstrably at odds with the intentions of its drafters,

> ... with respect to filing deadlines a literal reading of Congress' words is generally the only proper reading of those words. To attempt to decide whether some date other than the one set out in the statute is the date actually 'intended' by Congress is to set sail on an aimless journey, for the purpose of a filing deadline would be just as well served by nearly any date a court might choose as

by the date Congress has in fact set out in the statute.

*United States v. Locke,* 471 U.S. 84, 95, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64, 75 (1985). Though what we are dealing with here is not exactly a filing deadline, it is very close to it. The debtor's argument accepted in *In re Erickson Partnership,* that by cutting off the rights of certain farmers to file Chapter 12 the statute flies in the face of congressional intent may be cogently answered by the foregoing quotation from *Locke.* Where should the deadline be drawn? Is it "fair" that those farmers who filed Chapter 7 in 1979–1985 and who have had their farms liquidated are barred from reopening their cases and converting them to Chapter 12? *See In re Spears, supra.* Is it "fair" that a family farm debtor who obtained a confirmed Chapter 11 plan pledging and performing full repayment before the advent of Chapter 12 should not now have the option to convert to Chapter 12 and recover his full payment? What does fairness have to do with the issue at all? A deadline has to be drawn and the words of the statute have placed it at November 26, 1986. Looking at congressional history to determine *why* that date was chosen is a waste of considerable (as is apparent from the length of this opinion) judicial time and effort.[7]

---

**7.** Judges Nims and Howard have performed a service by uncovering the footnote in Judge (now Justice) Scalia's concurring opinion in *Hirschey v. F.E.R.C.,* 777 F.2d 1, 7–8, n. 1 (D.C. Cir.1985) in their recent opinion *In re Rossman,* 70 B.R. 985 (Bankr.W.D.Mich.1987). The footnote deserves repetition:

> Several years ago, the following illuminating exchange occurred between members of the Senate, in the course of floor debate on a tax bill:
>> Mr. ARMSTRONG.... My question, which may take [the chairman of the Committee on Finance] by surprise, is this: Is it the intention of the chairman that the Internal Revenue Service and the Tax Court and other courts take guidance as to the intention of Congress from the committee report which accompanies this bill?
>> Mr. DOLE. I would certainly hope so....
>> Mr. ARMSTRONG. Mr. President, will the Senator tell me whether or not he wrote the committee report?
>> Mr. DOLE. Did I write the committee report?
>> Mr. ARMSTRONG. Yes.

> Mr. DOLE. No; the Senator from Kansas did not write the committee report.
> Mr. ARMSTRONG. Did any Senator write the committee report?
> Mr. DOLE. I have to check.
> Mr. ARMSTRONG. Does the Senator know of any Senator who wrote the committee report?
> Mr. DOLE. I might be able to identify one, but I would have to search. I was here all during the time it was written, I might say, and worked carefully with the staff as they worked....
> Mr. ARMSTRONG. Mr. President, has the Senator from Kansas, the chairman of the Finance Committee, read the committee report in its entirety?
> Mr. DOLE. I am working on it. It is not a bestseller, but I am working on it.
> Mr. ARMSTRONG. Mr. President did members of the Finance Committee vote on the committee report?
> Mr. DOLE. No.
> Mr. ARMSTRONG. Mr. President, the reason I raise the issue is not perhaps apparent on

Moreover, for whatever weight it carries, we also note that "bankruptcy statutes ordinarily are not given retrospective application." Sutherland *Stat. Const.* § 69.07 (4th ed. 1986).

In conclusion, we hold that § 302(c)(1) clearly and unambiguously directs that courts may not permit debtors who have cases pending on November 26, 1986 to convert those cases to Chapter 12 of the Bankruptcy Code. We further hold that the law prohibits us from deviating from applying the plain words of that statute merely to accommodate arguably contrary words expressed in legislative history. We do so not because the Supreme Court has told us we must, but because even though it told us that we may do otherwise, we distrust those pronouncements. For these reasons, we hold that the debtor here lacks the ability to convert its case to Chapter 12 and therefore, the motion will be denied. An order consistent with this opinion will be entered contemporaneously herewith.[8]

the surface, and let me just state it: .... The report itself is not considered by the Committee on Finance. It was not subject to amendment by the Committee on Finance. It is not subject to amendment now by the Senate. ....

... If there were matter within this report which was disagreed to by the Senator from Colorado or even by a majority of all Senators, there would be no way for us to change the report. I could not offer an amendment tonight to amend the committee report.

... [F]or any jurist, administrator, bureaucrat, tax practitioner, or others who might chance upon the written record of this proceeding, let me just make the point that this is not the law, it was not voted on, it is not subject to amendment, and we should discipline ourselves to the task of expressing congressional intent in the statute.

8. Two postscripts are worthy of note. First, the March, 1987 issue of Bankruptcy Service, Lawyers Edition, Current Awareness Alert, has a most informative article about the problem of statutory construction in this context, entitled, "Family Farmer Conversion Issue: An Analysis of the Law and the Judicial Response to It". Unfortunately, it was released a wee bit too late to have been of much assistance in the writing of this opinion.

Second, disappointed farm debtors have reason to hope for a legislative solution to the legislatively-created conundrum: H.B. 1152 and S.B. 565 would enact explicitly the recommendation in the conference committee report. It would strike paragraph (1) of section 302(c) and make the provisions of the Family Farmer Bankruptcy Act of 1986 retroactive within the discretion of the bankruptcy court.